468 So.2d 785 (1985)
Murphy M. ARCEMONT, Jr. and Bridget M. Arcemont
v.
Hiram B. VOISIN and The Home Insurance Company.
No. 84 CA 0195.
Court of Appeal of Louisiana, First Circuit.
April 16, 1985.
Rehearings Denied May 9, 1985.
*786 Kim P. Stansbury, Morgan City, for plaintiffs-appellants.
Craig W. Marks, Jeansonne, Briney & Goudelocke, Lafayette, for defendant-appellee Home Ins. Co. and Hiram Voisin.
Matthew J. Hill, Jr., Roy, Forrest & Lopresto, Lafayette, for defendant-appellee State Farm Mut. Ins. Co.
James B. Supple, Bauer, Darnall & Boudreaux, Franklin, for defendant-appellee Hiram Voisin.
Before GROVER L. COVINGTON, C.J., and LOTTINGER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This is a suit for personal injuries tried before a jury. From a jury verdict awarding plaintiff $25,000 and its finding that no uninsured/underinsured coverage was in effect on the car plaintiff was driving, plaintiffs, Bridget and Murphy Arcemont, devolutively appealed the August 29, 1983 judgment of the Sixteenth Judicial District Court, St. Mary Parish, Hon. Robert E. Johnson, Judge, making the jury verdict the Court's judgment.

FACTS
Bridget Arcemont, a 34 year old mother of ten and eleven year old sons, had stopped her automobile behind other vehicles which had stopped in response to a red light on U.S. Highway 90 in Morgan City on January 3, 1980. Her car was violently rear-ended by a pickup truck owned and being driven by Hiram B. Voisin and insured by Home Indemnity Company. *787 She sustained serious and painful injuries and a 10-15 percent disability of the body.
Mrs. Arcemont was initially treated at the emergency room of Lakewood Hospital in Morgan City immediately after the accident; the next day she consulted her family doctor who prescribed pain relievers, muscle relaxers, hot showers and baths, and the use of heating pads for about ten days. Having ascertained that Mrs. Arcemont had not improved in ten days postaccident, the family doctor scheduled an appointment for her to be examined by an orthopedic surgeon who saw her initially on January 24, 1980, or 20 days post-accident. The orthopedic surgeon's X-ray examination revealed some suggestion of forward slipping of L/5 and compression of the intervertebral disc space between C/5 and C/6. At the initial visit to the orthopedic surgeon, Mrs. Arcemont complained of intense pain in the neck, lower back, and lower legs. The same complaints of pain were repeated during visits to the orthopedic surgeon on May 14 and September 3, 1980 and telephone consultations on March 17, April 21 and August 22, 1980. The orthopedic surgeon referred Mrs. Arcemont to Dr. Rivet, a neurosurgeon, who conducted a neurological examination on September 8, 1980. Dr. Rivet's opinion was that Mrs. Arcemont possibly had sustained a ruptured disc in her neck and prescribed muscle relaxers, physical therapy, and traction for two weeks. A September 22, 1980 visit to Dr. Rivet revealed that her condition had worsened and that she was experiencing numbness in the left hand; he therefore recommended myleography of the cervical and lumbar areas and admitted her to the hospital on October 9, 1980 for that purpose. Mrs. Arcemont recuperated in the hospital from myleography. On October 14, 1980, after Dr. Rivet had her seen by Dr. Dunlop, a neurologist, who concurred that she needed two surgical procedures, back surgery, consisting of a total laminectomy of L-5, was performed. Postoperative pain necessitated using narcotics. On October 28, 1980 Dr. Rivet performed the second surgery, consisting of removing the disc at C-5/C-6 and fusing the C-5/C-6 vertebrae with a bone plug removed from Mrs. Arcemont's hip. Mrs. Arcemont was released from the hospital on November 5, 1980, after a 27 day confinement. Post-hospitalization instructions included doing nothing more than she did during her hospital confinement, wearing a hard plastic cervical collar at all times, day and night, and wearing a specially fitted corset for back support.
Dr. Rivet examined Mrs. Arcemont at his office on November 24, 1980, January 5, February 9, April 13, August 24, November 23, and December 21, 1981 and March 1 and June 28, 1982. Although Mrs. Arcemont was in another automobile accident on December 18, 1981 and fell on her back and buttocks in an accident at home on February 18, 1982, Dr. Rivet opined that the neck and back conditions, the injuries forming the basis of this suit, were sustained in the January 3, 1980 accident. Dr. Rivet referred Mrs. Arcemont to Dr. Blackburn, a psychiatrist, to help her with the depression and anxiety she experienced after the accident and the surgical procedures to alleviate the resulting problems. Dr. Blackburn treated Mrs. Arcemont on five visits to his office, the first visit being on July 13, 1982 and the last one being on August 19, 1983, three days prior to trial. In Dr. Blackburn's opinion Mrs. Arcemont's emotional state was normal, taking into account the trauma she had experienced, the anxiety associated with undergoing two surgical operations, a myleogram, a discogram, and the considerable pain she endured.
Mrs. Arcemont had a severe allergic reaction to a drug Dr. Blackburn prescribed to combat muscle inflammation; she broke out in a red rash all over her body and required an injection of other medicine to counteract the drug reaction. Dr. Blackburn's opinion was that the primary cause of her continuing pain was not emotional or psychological but felt "she had some degree of excessive tension and anxiety and some normal depression in reaction to that physical discomfort".
*788 Three other neurosurgeons, Drs. Jackson, Richardson, and Kenning, the latter two in practice together, treated Mrs. Arcemont from September 30, 1982 through February 7, 1983. Dr. Jackson's X-ray examination formed the basis for his belief that C-6/C-7 was not normal and after performing a CT scan recommended that she undergo a cervical discogram if pain from that area continued unabated. Drs. Richardson and Kenning performed a cervical myleogram and a cervical discogram at Hotel Dieu Hospital in New Orleans on February 21 and 24, 1983, respectively. They found abnormalities which they believed were the source of her considerable neck pain.
Mrs. Arcemont's permanent disability was assessed by the medical experts at 10 percent to 15 percent of the body. She has disfiguring scars on the front of her neck, back and hip; those scars were caused by the necessary surgical procedures performed on her.
The very active life which Mrs. Arcemont had enjoyed was effectively ended by the accident and resulting injuries and disability. Conjugal relations were non-existent for an extended time following both the accident and the surgical procedures. For about seven months Mrs. Arcemont wore the hard plastic cervical collar even when she slept and after that she wore a soft cervical collar for in excess of one year.
As late as the trial, which commenced on August 22, 1983, Mrs. Arcemont was experiencing pain and discomfort regularly and with various degrees of intensity.
Defendant Voisin's liability insurance was for only $25,000. Mrs. Arcemont's medical expenses totaled $18,154.85 through February, 1983 and totaled over $13,000 before the date of the December 18, 1981 automobile accident. During the course of the trial the insurer of the automobile Mrs. Arcemont and her husband owned, State Farm Mutual Automobile Insurance Company, tendered payment of $13,000 under the Medical Payment provision of the policy insuring their automobile, which tender was made in open court with the jury present.
Mr. and Mrs. Arcemont named State Farm a defendant, alleging that State Farm was liable for Mrs. Arcemont's damages to the extent Voisin's insurance would not adequately compensate her for her injuries and damages resulting from them under the terms of the Uninsured Motorist coverage they believed to be in force.
Bridget McCleary Arcemont, her mother, and Mrs. Arcemont's siblings owned the incorporated business known as McCleary's Funeral Home. The funeral home corporation obtained automobile insurance for motor vehicles owned by the funeral home and for vehicles owned by the individuals who owned the corporation; the corporation paid for the insurance on all vehicles, corporate and individually owned; the individually owned vehicles were used in the business, to transport pallbearers as well as the bereaved, as the occasion required.
James Patrick McCleary, owner of an unspecified percentage of the funeral home corporation, worked with his father in the business and after his father's death in February, 1977 he was named President and attended to the day-to-day operations of the business. During his late father's lifetime the automobile insurance was handled by the Ourso agency, a part of the State Farm network. Before policy renewal time arrived, Mrs. Ourso of the Ourso agency, at the request of the McCleary Funeral Home stockholders, went to McCleary's place in 1977 and answered numerous questions posed regarding coverages and their cost, the objective being to maximize coverage for minimum cost, consistent with the funeral home stockholders' individual conceptions of requirements of umbrella excess coverage insurance issued by State Farm on vehicles owned by the corporation and by the individuals comprising the corporation.
The testimony regarding the actual place of the meeting to discuss insurance coverage, the persons present at the meeting, and the decision, if any, made then or at a later time, is conflicting. Mrs. Ourso testified *789 that James Patrick McCleary and his wife met with her and her son who was preparing to take over his deceased father's agency and that the meeting was at James Patrick McCleary's residence, not at the funeral home. Her son concurred in her testimony. The Ourso son denied having told the persons at the meeting that Uninsured Motorist coverage equal in amount to Bodily Injury coverage was one prerequisite of the umbrella excess coverage policy the corporation had secured for corporation and individually owned vehicles. Mrs. Ourso testified that a day or so after the meeting Mr. McCleary informed her by telephone that he wanted to delete uninsured motorist coverage and that her secretary signed his name to the rejection form required by law and State Farm to effectuate deletion of that coverage. Mr. McCleary, his wife, Murphy Arcemont, and Bridget Arcemont all testified that Mrs. Ourso, alone at the meeting with the McCleary family, left with the clear understanding and direction to continue the uninsured motorist coverage in the same amount as bodily injury coverage. Mr. McCleary testified he gave no person authority to sign his name to any insurance form.
Before renewal time arrived in 1979 the Ourso agency, at the request of McCleary and with the concurrence of State Farm's home office, transferred the McCleary Funeral Home insurance account to the Pendas State Farm agency in Morgan City. After the previous year's policies had been renewed McCleary or his wife received a telephone request that McCleary go to the Pendas agency and sign some insurance forms. The forms he signed were required forms for rejection of uninsured motorist coverage in each of the several policies issued by State Farm.
The Pendas and Ourso families knew the McCleary family on a personal friendship basis as well as the business relationship which existed. They knew the funeral home was an incorporated business and that after the death of the elder McCleary the widow and his children owned and continued to operate the business until late in 1980 when it went out of business.
The Ourso agency owners and Pendas agency owner knew that Mr. McCleary was conducting corporation business when the insurance transactions took place. They knew that McCleary Funeral Home, Inc. was not wholly owned by James Patrick McCleary.

ASSIGNMENTS OF ERROR
The jury erred by:
1. abusing its discretion in awarding a lump sum of $25,000 for general damages and medical expenses under the totality of circumstances;
2. finding that McCleary Funeral Home, Inc., the named insured of State Farm, knowingly and affirmatively rejected in writing the uninsured motorist optional coverage in the policy insuring the Arcemont automobile; and
3. failing to reform the State Farm insurance policy to provide uninsured motorist coverage equivalent to the bodily injury coverage as specified by R.S. 22:1406(D)(1)(a).

ISSUES
The issues are:
1. Was the optional uninsured motorist coverage validly rejected by McCleary Funeral Home, Inc.?
2. If the first issue is answered in the negative, did the jury commit error in failing to reform the policy of insurance to comply with R.S. 22:1406(D)(1)(a)?
3. Does a lump sum award of $25,000 under the totality of circumstances constitute an abuse of the jury's discretion?
4. If the third issue is answered in the affirmative, what sum should have been awarded to compensate Mrs. Arcemont for general damages and medical expenses, past and future?

TRIAL COURT
The Trial Judge refused Voisin's request to present to the jury evidence which would *790 show his relative impecuniousness and therefore his inability to pay any damages awarded in excess of liability insurance limits of $25,000. Voisin's attorney made a proffer of proof on that point out of the presence of the jury and was instructed by the judge not to allude to Voison's alleged inability to pay in closing argument.
The Judge's charge to the jury on the law applicable to the case included a verbatim reading of R.S. 22:1406(D)(1)(a), the rejection of uninsured motorist coverage statute, quoted in pertinent part as follows:
"... Any document signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto."
About a page and one half later in the charge the judge stated in part as follows:
"The next charge: A standard insurance form signed by an official of the insured rejecting uninsured motorist coverage meets the formal requirement for rejection of the uninsured motorist coverage and is effective from the date of signing." (Emphasis supplied)
We now proceed to a discussion of the issues in the order set out above.

REJECTION OF UM COVERAGE
State Farm Policy No. 1626 597 D24 18, naming as the insured "McCleary Funeral Home, Inc.", covering the period April 24, 1979 to April 24, 1980, was countersigned by Wilson P. Pendas, agent, on June 12, 1979. Endorsement 6080.3A, attached to the policy, being the fleet schedule, identified with specificity the Arcemonts' Buick which Mrs. Arcemont was driving when Voisin struck her. The signature, "J.P. McCleary", appears on State Farm's form, dated May 17, 1979, in which uninsured motorist coverage was rejected as to the Buick listed on the fleet schedule; the UM rejection form was not attached to the issued policy but was instead retained in State Farm's home office. The policy was sent to McCleary Funeral Home, Inc. and placed in its files. The policy reflects bodily injury/property damage liability limits of 300/300/100 but no UM coverage.
R.S. 22:1406(D)(1)(a) embodies in the strongest and clearest language that it is the public policy of Louisiana that insureds be covered by uninsured motorist insurance in the amount of the bodily injury limits unless the insured reject such in writing. Aramburo v. Travelers Ins. Co., 426 So.2d 260 (La.App. 4th Cir.1983). Redmann, C.J., for the Court in Aramburo, stated that "It... [is] the insurer's burden to prove either rejection or else selection of lower limits if the insurer is to escape the statutory obligation that its policy shall contain UM coverage equal in amount to its bodily injury coverage". 426 So.2d at 261.
In Lilliedahl & Mitchel, Inc. v. Avoyelles Trust & Savings Bank, 352 So.2d 781 (La.App. 3rd Cir.1977), the corporate resolution authorized its president and principal stockholder, Marvin Lilliedahl, "to carry bank accounts for [the corporation] in such banks as he may deem best and to make the profits of money belonging to [it] in such accounts, and disburse monies on his signature for any purpose in connection with the purpose of the Corporation." (Brackets and emphasis supplied) The Court rejected the bank's contentions that the resolution (1) "granted Lilliedahl actual authority to apply the proceeds from corporate certificates of deposit to his personal indebtedness" and, in the alternative, (2) constituted "apparent authority to justify the Bank's action". In rejecting the first contention the Court reasoned:
"... It is almost too elementary to state that the personal indebtedness of a corporate officer has nothing to do with the purposes of a corporation." 352 So.2d at 787.
As to the apparent authority argument, the Court reasoned as follows:
"... Apparent authority is a doctrine created by the courts to protect persons dealing in good faith with corporate officials where the corporation has taken *791 such action or inaction as to justify a belief that the official has acted with authority. The doctrine has two requirements: (1) The principal must make some form of manifestation to an innocent third party; and (2) The third party must rely reasonably on the purported authority of the agent as a result of the principal's manifestations. (citations omitted) The reasonableness of the reliance is determined from all the facts and circumstances of the case. (citation omitted)
"... Banks stand in a peculiarly unique place in the business world. They are entrusted with huge sums of money by their depositors and must proceed cautiously when dealing with deposited sums. We also note that it is axiomatic that a corporation can only act through individuals and these individuals must be given legal power to act on behalf of a corporation...." 352 So.2d at 787. (Emphasis ours)
In AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc., 385 So.2d 426 (La.App. 1st Cir.1980), we affirmed the lower court's judgment which held Big Chief had not clothed its terminal manager with apparent authority to purchase truck tires, reasoning, in part, as follows:
"The concept of apparent authority only comes into play when the agent has acted beyond his actual authority and has no permission whatsoever from his principal to act in such manner. The principal will be bound for such actions if he has put his agent in such a position or has acted in such a manner as to give an innocent third person the reasonable belief that the agent has authority to act for the principal. The facts and circumstances of each case must be examined to determine the reasonableness of the third party's belief. One must look from the viewpoint of the third person to determine whether an apparent agency has been created....
"...
"... The only action of Big Chief upon which [plaintiff's president] Taylor could possibly have relied was the act of placing Dixon in charge of the [Big Chief] Baton Rouge operation as terminal manager. This alone, however, was insufficient to give Taylor a reasonable belief that Dixon had authority to purchase tires for his principal, Big Chief." 385 So.2d at 429-430. (Bracketed material ours)
In Kingsman Enterprises, Inc. v. Bakerfield Electric Company, Inc., 339 So.2d 1280 (La.App. 1st Cir.1976), we held that "the totality of facts ... [did] not support a finding that the corporations [principally owned by Womack] had ceased to exist as entities, separate and distinct from their principal shareholder". In reaching that result, we reasoned, in part, as follows:
"The general rule that corporations are distinct legal entities, separate and distinct from the individuals who compose them, is statutory in origin and well recognized in the Louisiana jurisprudence. (citation omitted)....
"...
"... Regardless of the basis for piercing the corporate veil, it is clear that the situation must be viewed with regard to the totality of circumstances in each case. However, it should be kept in mind that in Louisiana the concept of the separation of the corporate entity from its shareholders is the general rule and is firmly established. Because of the beneficial role of the corporate concept, this principle should be disregarded in only exceptional circumstances....". 339 So.2d at 1282-1283. (Bracketed material ours)
In the present case it is uncontradicted that the stockholders/directors of the funeral home corporation never adopted a corporate resolution authorizing James Patrick McCleary to decline UM insurance on the fleet policy covering vehicles owned by the corporation and the individuals comprising the corporation. The corporation paid the entire fleet policy premium. The Pendas agency handled the corporation's insurance for the first time in 1979 for the policy period commencing April 24, 1979 and ending April 24, 1980. Wilson Pendas *792 knew that the corporation was owned by James Patrick McCleary, his mother, and his siblings because he knew the McCleary family on a personal friendship basis long before he became the corporation's insurance agent. The elements of apparent authority are not shown by the record.
In Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978), writ denied, 362 So.2d 802 (La.1978), we stated that:
"In a jury trial, the judge is not required to give the precise instructions submitted by either party, but he must give instructions which properly reflect the law applicable in the light of the pleadings and facts in each particular case. If instructions concerning negligence and liability are confusing or misleading, or omit an applicable essential legal principle, such instructions constitute reversible error. Gonzales v. Zerox corporation, 320 So.2d 163 (La. 1975)." Id, at 250. (Emphasis ours)
The excerpt from the Trial Judge's jury instructions utilized the phrase "named insured or his legal representative", taken from the statute, and followed it with the charge that "an official of the insured" can validly reject the UM coverage and thereby bind the named insured. The instruction on the law was not only confusing and misleading, it also left out an applicable essential legal principle, namely, that for a corporation to be bound by its officer's actions the actions must have been authorized by the corporation. The instruction, for all practical purposes, equated "legal representative", as used in R.S. 22:1406(D)(1)(a), with "official of the insured" used later on in elaborating on the statutory requisites for rejection of UM coverage. "Legal representative" and "duly authorized official of the insured corporation" can be regarded in law as synonymous. Absent the authority granted by the corporate insured to act for the corporation, the "official of the insured corporation" is not the "legal representative" of the named insured within contemplation of the statute.
The essence of the Trial Judge's jury instruction on rejection of UM coverage was to pierce the corporate veil of McCleary Funeral Home, Inc. and state as a matter of law that the corporation was James Patrick McCleary's alter ego, a result clearly not permitted by the jurisprudence. If the jury instructions had included a charge on the concepts of "actual authority", "apparent authority", "corporate identity", and differentiation between corporations and "the individuals who compose them", the instructions would not have been fatally flawed.
The Trial Court failed to provide all the instruction on the law required in this case and we find this omission erroneous. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). The Trial Court's special jury instruction failed to define the term "legal representative" used in the statute and additionally erred in failing to explain that for an official of the corporation to bind the corporation the official must have the actual or apparent authority to do the thing which he did.
We hold that McCleary Funeral Home, Inc., the named insured in the policy insuring corporate owned and individually owned vehicles, in which latter class the Arcemont vehicle belongs, did not validly reject in writing the optional uninsured motorist coverage. We hold further that the policy is reformed, by R.S. 22:1406(D)(1)(a), to provide uninsured motorist coverage in an amount not less than the limits of bodily injury liability of $300,000 provided in the policy. A.I.U. Insurance Company v. Roberts, 404 So.2d 948, 952 (La.1981). Proper instructions on all of the essential principles would have afforded the jury the opportunity to do what we now do.
We now proceed to decide the quantum issues presented by this case.

QUANTUM
Our close scrutiny of the testimony, both live and deposition, leads to the inescapable conclusion that the jury's lump sum award of $25,000 for general damages *793 and medical expenses constituted an abuse of "much discretion" accorded it as the trier of fact by C.C. art. 1934(3). The appellate court should not disturb "such a finding of fact unless it is clearly wrong. Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)." Arceneaux v. Dominque, 365 So.2d 1330, 1333 (La.1978). Without reiterating the narrative of facts stated earlier in this opinion, it is not merely coincidental that the jury established the damages in the same amount of the policy limits of Voisin's liability insurance policy introduced into evidence. Having determined that the damages awarded Mrs. Arcemont constitutes an abuse of the trial jury's discretion, we must ascertain the amount of damages which should have been awarded for her pain and suffering, mental pain and anguish, disfigurement, and medical expenses, both past and future.
The Supreme Court emphasized in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), that "before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award" and stated that:
"... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. (citations omitted) It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.
"Further we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal...." Id. at 335.
In Reck v. Stevens, 373 So.2d 498 (La. 1979), the Supreme Court stated that:
"In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) "similar injuries, see Coco at 341 So.2d 334." Id., 501.
In the present case Mrs. Arcemont sustained serious and painful injuries of a disabling nature, the whole body disability attributable to the injuries and two surgeries made necessary by the injuries being 10 percent to 15 percent. Additionally, she underwent two myelograms and one discogram, one myelogram before the back and neck operations, and one myelogram and the discogram after the back and neck surgeries. She experienced depression of such severe nature that one of her neurosurgeons referred her to a psychiatrist for treatment which lasted about one year at time of trial. Mrs. Arcemont has disfiguring scars on the front of her neck, hip and back. She was experiencing intense pain as late as trial date, over three years and seven months after the accident. The concensus of medical opinion is that Mrs. Arcemont will continue to experience pain of varying intensities and duration for an indeterminate length of time. At the time of the accident in January, 1980 Mrs. Arcemont was 34 years old and participated in many activities which required physical strength and stamina. All of that has changed now. Her recreational pursuits, a part of her past, are no longer bearable because of the pain they cause and, in part, *794 because of her emotional state caused by the accident and its aftermath.
Ever mindful of the Supreme Court's admonition not to pay too much attention to reported decisions which on their surfaces may be strikingly similar, and also mindful of the reality that no two cases are ever fully alike, we have scrutinized the quantum cases cited in plaintiffappellant's brief as well as cases revealed by our own independent research. Guided by those considerations and our analysis of reported decisions, we conclude that Mrs. Arcemont is entitled to an award of an additional $250,000 to compensate her for the pain and suffering (past and future), mental pain and anguish (both past and future), disfiguring scars (particularly on the front of the neck), and residual disability. We also hold that the community of acquets and gains existing between Bridget and Murphy Arcemont is entitled to be reimbursed for past medical expenses totaling $18,154.85 and an award of $5,000 for future medical expenses to pay for conservative treatment of her pain and suffering and psychiatric counseling to deal with the state of depression which Mrs. Arcemont experienced up to time of trial and which had not been resolved at that time.
No credit is due State Farm for the $13,000 check tendered the Arcemonts at the trial, the check representing benefits Mrs. Arcemont was entitled to under the medical payments coverage of the State Farm automobile liability policy. The collateral source doctrine, well established in Louisiana jurisprudence, bars State Farm from such credit. Lofton v. Whimper, 425 So.2d 1307, 1309 (La.App. 4th Cir.1983), and cases cited therein.
Accordingly, the judgment against Hiram B. Viosin and Home Indemnity Company, awarding Bridget McCleary Arcemont $25,000 is affirmed. The verdict of the jury finding the named insured, McCleary Funeral Home, Inc., validly rejected Uninsured Motorist coverage in the same amount as the bodily injury liability coverage is reversed. Judgment is rendered in favor of Bridget McCleary Arcemont individually, and against State Farm Mutual Automobile Insurance Company in the following amounts: (1) for past and future pain and suffering, and residual disability $150,000; (2) for past and future mental pain and anguish$50,000; (3) for disfiguring scars$50,000. Judgment is further rendered in favor of the community of acquets existing between Bridget McCleary Arcemont and Murphy Arcemont and against State Farm Mutual Automobile Insurance Company in the following amounts: (1) past medical expenses$18,154.85; and (2) future medical expenses $5,000. All sums are to bear legal interest from date of judicial demand until paid. State Farm is cast for all costs of the proceedings in the trial court and this court. C.C.P. art. 2164.
AFFIRMED IN PART: REVERSED AND AMENDED IN PART.