DREW, J.
hOn the morning of May 22, 2004, Mickey Johnston operated a 1999 Chevrolet Metro car owned by Double J Distributing Company, LLC, and insured by State Farm. In the intersection at the southwest corner of the courthouse square in Homer, his eastbound vehicle crashed with a southbound 1996 Ford Taurus owned and operated by Alvin Shelton, who was also insured by State Farm. Both drivers contended they had the green light when they drove into the intersection and collided.
Johnston contended that he entered the intersection protected by a green light and that Shelton ran a red light and struck him. Johnston alleged, that his car was totaled and he sustained injuries. After initially suing Shelton and State Farm, Johnston amended the petition adding Double J as a plaintiff. In addition, Johnston sued State Farm as uninsured/under-insured motorist insurer for himself and Double J. Shelton and State Farm responded, alleging that the accident was caused by Johnston’s negligent operation of his vehicle in failing to obey traffic signals, to keep a proper lookout, and to yield.
Prior to trial, the parties jointly stipulated that the individual claims of the parties did not exceed $50,000 exclusive of costs and interest. They further stipulated that the Double J vehicle operated by Johnston was insured by State Farm under policy # 78 4305-B10-18A issued to Double J. Under medpay coverage of the *584 Double J policy # 78 4305-B10-18A, State Farm paid medical expenses to Johnston of $4,335.90.
After hearing the testimony and receiving the evidence, the trial court apportioned 20% of the fault to Johnston and 80% of the fault to Shelton. | {.While Johnston sought to recover medical expenses of $47,056.46, the trial court found he was entitled to special medical expenses of $6,180.46 attributable to the accident. The amount of awarded medical expenses are not at issue in this appeal. In addition, the trial court awarded Johnston general damages of $25,000. The judgment of the trial court is affirmed.
TESTIMONY
Homer Police Chief Russell Mills investigated the accident and was unable to determine fault. When he arrived on the scene, he found that Johnston “had a pretty good knot on his head.” Johnston reported he traveled east on South Main toward the square. He had a green light as he approached the intersection and continued on into the intersection where Shelton’s car struck his.
Shelton told the chief he was driving south on Highway 79 along the west side of the Homer town square. Further, the light was green and he drove into the intersection.
Chief Mills found a yaw mark from the left rear tire of the Johnston ear which indicated the path of Johnston’s car after the wreck. The chief said that the dent on the rear door on the driver’s side occurred when the front of Shelton’s car struck Johnston’s. The dent just between the driver’s side front tire and the driver’s side front door resulted from the impact of Johnston’s car with the telephone pole after the car skidded into it. The chief stated the wreck was in the eastbound lane on the southern side of the intersection.
1 aJohnston’s testimony was that he traveled very slowly east on South Main so he would not have to stop at the red light. About ten feet from the intersection, he saw the light governing southbound traffic on Highway 79 turn from green to yellow. Johnston said he was barely moving and did not stop because he knew the light would be red for southbound traffic on Highway 79. He entered the intersection and saw Shelton’s vehicle in his peripheral vision. Although he tried to increase his speed to avoid the collision, his vehicle did not have sufficient power to get out of the way. Shelton’s vehicle struck the left rear door of Johnston’s vehicle, which was spun around and into a pole on his left front bumper.
Shelton’s version was that he was traveling south on Highway 79 and entered the north side of the courthouse square and observed that the light at the Highway 79 intersection with South Main was green. When he was at the southwest intersection, the light turned yellow. He felt and heard the impact before he saw Johnston’s car. Shelton’s right front bumper and headlight were damaged. Shelton’s car was insured by State Farm under a policy issued to him and his wife.
REASONS FOR JUDGMENT
The trial court noted that Johnston was driving east on South Main, which runs east and west along the south side of the Claiborne Parish courthouse square. All four sides of the streets running around the courthouse square are one way and are part of U.S. Highway 79. Shelton was traveling south on West Main (Highway 79), which runs along the west side of the courthouse square. Northbound drivers on Highway 79 had to |4traverse three sides of the square on South Main, East Main, and North Main to proceed north on *585 West Main (all Highway 79). Southbound drivers on Highway 79 had to drive down only one side of the square on West Main (also Highway 79) to continue south on West Main/Highway 79. The trial court stated that neither South Main nor West Main had priority status and both streets were controlled by traffic lights.
The trial court found that both Johnston and Shelton, the only witnesses, were credible and told the truth about the facts of the collision as they understood them. Based upon the point of impact at the left rear door of Johnston’s car, the trial court decided that Johnston’s car had preempted the intersection when the crash occurred. Shelton should have seen Johnston’s car before impact. Johnston’s testimony was that he never intended to stop at the intersection. The trial court found that Johnston began traveling through the intersection when he saw the light governing West Main (southbound Highway 79) turn from green to yellow. Had Johnston been reasonably prudent, he should have seen Shelton’s car. Both drivers chose to drive into the intersection when the light governing southbound Highway 79 (West Main on which Shelton was driving) turned yellow without checking for other motorists. Because Johnston’s car had almost cleared the intersection when struck, the trial court fixed Shelton’s fault at 80% and Johnston’s at 20%.
Based upon Johnston’s failure to provide documentary evidence of the loss of income to both himself and Double J, the trial court declined to award either with loss of income. Moreover, although both Johnston and |5Double J suffered loss of use of the totaled vehicle, there was no proof as to the value of the claims, so the trial court made no award.
As to Johnston’s physical injuries, State Farm paid $4,335.90 while Johnston contended his medical bills totaled $47,056.46. Based upon medical testimony, the trial court disallowed as unrelated to the collision Johnston’s claims for injuries and surgeries on his shoulder and knee. Finding medical support for Johnston’s post-concussion syndrome a year after the accident, the trial court awarded Johnston special medical expenses of $6,180.46 attributable to the accident. In addition, the trial court awarded Johnston general damages of $25,000 due to past and present pain and suffering and loss of enjoyment of life. Johnston continued to suffer from pain and depression along with facial discoloration due to trauma to his left eye and decreased physical vigor. Both awards were reduced by 20% attributable to Johnston’s fault.
DISCUSSION

Fault

Shelton, the southbound defendant, and his insurer appealed, complaining that the trial court erred in assessing him with 80% of the fault based upon incorrect determination of street priority and insufficient evidence, in failing to credit his insurer with medical payments made under the policy and in awarding excessive general damages based upon the medical testimony.
Johnston, the eastbound plaintiff, answered the defendant’s appeal and urged that the trial court erred in assessing him with 20% of the fault for |fithe wreck, since Shelton was 100% at fault and in failing to award damages to Double J Distributing Company.,
State Farm, as uninsured motorist carrier for Double J, also answered the appeal and asserted that its Double J State Farm auto policy # 78 4305-B10-18A paid $4,355.90 to Johnston on his medical expenses. Double J sought to be credited for that payment should this court *586 assess any more fault against Shelton. Double J also objected to the assessment of costs against it. In spite of filing the answer to the appeal, State Farm (as Double J’s UM insurer) did not file a brief. Therefore, its answer to this appeal is considered abandoned. Uniform Rules of Courts of Appeal 2-8.6.
In Cosby v. Holcomb Trucking, Inc., 2005-0470 (La.9/6/06), 942 So.2d 471, 479, the supreme court discussed appellate review of factual findings:
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
(Citations omitted.)
j 7This record and the evidence and testimony contained therein provide reasonable factual bases for the trial court’s factual findings. The trial court was not clearly wrong is assigning 80% of the fault to Shelton, who stated he saw his light turn yellow when he was in the intersection. Shelton admitted he did not see Johnston’s car until he heard the impact. Notwithstanding Shelton’s testimony that his car struck the side front bumper of the Johnston car, the trial court accepted the testimony of the investigating officer and Johnston along with the physical evidence that the impact struck the rear driver’s side door on Johnston’s car, which spun into the pole damaging the front side bumper.
We find meritless Johnston’s assertion that Shelton should have been found 100% at fault. Neither driver was as careful as he should have been. Johnston was properly assigned 20% of the fault for his negligence in failing to see Shelton in time to avoid the crash. Prior to the wreck, Johnston saw Shelton’s vehicle and tried to take evasive action. The damage was on Johnston’s driver’s side rear door and on Shelton’s right (passenger side) front bumper. The trial court reasonably found that Johnston had almost cleared the intersection when struck by Shelton. Shelton’s complaints that the trial court erred in finding neither street had priority is without merit. As revealed by the testimony and found by the trial court, the collision was in the eastbound, southernmost lane in the intersection at which point both streets and the entire intersection constituted portions of U.S. Highway 79.
| ¿Credit to State Farm for Medical Payments to Johnston
We find no merit in the complaint of Shelton and his insurer, State Farm, that the trial court erred in failing to give Shelton and State Farm a credit for the $4,335.90 in medical payments *587 made by Double J’s insurance policy on the vehicle Johnston drove. A tortfeasor may not benefit, and an injured plaintiffs tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor’s procuration or contribution. O’Connor v. Litchfield, 2003-0397 (La.App. 1st Cir.12/31/03), 864 So.2d 234.
The supreme court stated in Louisiana Dept. of Transp. and Development v. Kansas City Southern Ry. Co., 2002-2349 (La.5/20/03), 846 So.2d 734, that under the collateral source rule, the payments received from the independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer. Among the public policy concerns supported by the collateral source rule are that the defendant should not gain an advantage from outside benefits provided to the plaintiff independently of any act of the defendant. The collateral source rule promotes tort deterrence and accident prevention. Absent the collateral source rule, injured parties would be discouraged from purchasing insurance or pursuing other forms of reimbursement available to them.
Under the collateral source rule, State Farm as Shelton’s insurer would not be entitled to a credit against medical payments made to Johnston from another insurer to which Double J paid a premium to protect the operators of its vehicles. The coincidence that both drivers had State Farm ^insurance should not work as a windfall to Shelton and his insurer, simply because Johnston also had benefit of a State Farm policy purchased by Double J. The trial court did not err in denying State Farm’s request for a credit for the medical payments made under Double J’s policy protecting Johnston.

General Damages

Shelton and his insurer, State Farm, assert that the trial court abused its discretion is awarding Johnston $25,000 in general damages, subject to the 20% reduction for Johnston’s fault. The trial court has great discretion in assessing damages. For an appellate court to change an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award based upon the facts and circumstances peculiar to the case and the individual under consideration. To correctly determine whether an award is excessive, the appellate court must determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Hayes v. State Farm Insurance Co., 40,649 (La.App. 2d Cir.4/20/06), 928 So.2d 742.
The defendants characterized Johnston’s injuries as a left eye bruise and mild chest wall pain with only three doctor visits and no physical restrictions. In the opinion of Shelton and State Farm, general damages to Johnston did not exceed $3,500.
The parties stipulated that Dr. William Mark Haynes, a board-certified family physician, was an expert in family medicine. Two days |inafter the May 22, 2004, accident, Dr. Haynes saw Johnston, who reported the wreck and complained of drowsiness, dizziness, and chest wall pain. Dr. Haynes’s diagnoses were chest wall contusion and a closed head injury for which he ordered a CAT scan. Following that test, Dr. Haynes ordered an MRI due to a benign calcified mass unrelated to the accident and because the test “might prove further” in Johnston’s symptoms, difficulty in concentrating, blurred vision, dizziness, and generalized weakness. His neurologi *588 cal exam was normal. Johnston had a large bruise on his left arm near the shoulder and a resolved bruise that remained significantly dense under the left eye. Dr. Haynes continued the anti-inflammatory medication initially and prescribed oral narcotic pain medicine.
Dr. Haynes stated that Johnston had multiple contusions and abrasions along with post-concussion syndrome resulting from the wreck. On June 1, Dr. Haynes found weight loss and fatigue, eye blurring and pain, neck pain and stiffness, bruising, nausea, anxiety and insomnia, headache, dizziness, joint pain, stiffness and swelling, and back pain all attributed to the accident. On June 22, 2004, Johnston had a followup visit for post-concussion syndrome and unrelated thumb problems. On July 8, 2004, Dr. Haynes prescribed sleep medication for the post-concussion syndrome and pain medication for an unrelated knee injury.
On June 30, 2005, Dr. Haynes discussed the post-concussion syndrome for which Johnston continued to have symptoms of headaches, weakness, and dizziness. In his opinion, post-concussion syndrome has an indefinite course and could certainly be within that time frame. While Dr. I iiHaynes hesitated to say the symptoms were more probably than not related to the accident, he did say “it was definitely documented in my thinking at the time that it was related to it.” Dr. Haynes stated that Johnston had a history of ongoing musculoskeletal pains which were definitely increased by the wreck, although it was difficult to separate what was chronic and what was wreck-related. The doctor stated Johnston continued to have bouts of pain which was consistent with post-concussion syndrome and that he had ongoing discoloration below his eye. At Johnston’s last visit to Dr. Haynes before trial on May 12, 2006, Dr. Haynes had no discussion or treatment of post-concussion syndrome.
On cross-examination, the doctor stated that at the July 8, 2004, visit, the discussion of the post-concussion syndrome was limited to finding Johnston was slightly improved. The doctor did not document placing any physical restriction upon Johnston due to the accident nor did he make any referrals to other doctors. No visits concerning post-concussion syndrome were documented from June 22, 2004, until June 30, 2005. Dr. Haynes reported that most symptoms for post-concussion syndrome are not treated but watched to see if referrals for further treatment are necessary. The doctor refused to characterize Johnston’s symptoms are “relatively mild” and said his contusion and concussion were “significant.” He also opined that Johnston was honest in relating his symptoms.
The trial court found that Johnston suffered past and present pain and suffering and loss of enjoyment of life. Johnston continued to suffer from pain and depression at trial. The trial court noted that the symptoms could Impossibly be attributed to other causes but found they “remain a legacy of the collision.” Moreover, he had facial discoloration remaining and lacked pre-accident physical vigor.
Dr. Haynes diagnosed Johnston with post-concussion syndrome and noted that those symptoms could last a long period of time. Johnston still had symptoms consistent with post-concussion syndrome over a year after the wreck. Johnston’s medical records revealed plaintiff had a prior history of musculoskeletal pain and depression. It is well settled that the wrongdoer takes his victim as he finds him and is responsible for all natural and probable consequences of the tort. If the defendant’s conduct aggravated a preexisting condition, the victim must be compensated. Hayes v. State Farm, supra. Dr. Haynes *589 clearly stated that Johnston’s symptoms were aggravated by the wreck.
Viewing the evidence in the light most favorable to Johnston, the $25,000 general damages award, while generous, was not an abuse of the trial court’s broad discretion. Notwithstanding his medical history of similar symptoms, Johnston, characterized by his doctor as honest and believed by the trial court, sustained significant bruising, lasting discoloration below his eye, and symptomatic post-concussion syndrome which increased his symptoms and decreased his energy. The trial court was not clearly wrong in awarding Johnston $25,000 in general damages (less 20% attributable to his fault).
| yJTohnston’s Other Claims
The totaled Metro was owned and insured by Double J. As previously noted, Double J did not appeal or answer the appeal. Therefore, complaints related to that entity are not before the court. Even if those claims had been properly raised, the trial court correctly found insufficient evidence to support awards for business losses to Double J, which presented no business, tax, or other financial records. Likewise, lack of Johnston’s personal tax returns left Johnston’s claim for personal financial loss unsupported.
DECREE
The judgment of the trial court is affirmed in all respects. Costs of the appeal are assessed to the defendants.
AFFIRMED.