PETTIGREW, J.
12Plaintiffs, Rachel and Paul Howard (plaintiffs), appeal a March 5, .2014 judgment rendered in their favor after a jury trial, awarding personal injury damages sustained by Ms. Howard, as a result of her vehicle being rear-ended and pushed through a wooden fence, by a vehicle driven by the defendant Tekisha Greenup (Ms. Greenup), on August 10, 2009. Plaintiffs also appeal a November 14, 2018 pretrial judgment of the district- court that sustained exceptions raising the objections of no right and no cause of action in favor of the defendants, Ms. Greenup and her automobile liability insurer, United Services Automobile Insurance Association (USAA), dismissing plaintiffs’ claims against them for statutory penalties and attorney fees. That same judgment also granted the defendants’ motion to adjudicate credits in the amount of the policy limits paid to Ms. Howard by State Farm Mutual Automobile Insurance Company (State Farm), plaintiffs’ UM insurer.
After a thorough review of plaintiffs’ assignments of error, the. applicable law, and the record before us, for the reasons that follow, we reverse in part the November 14, 2013 judgment, specifically, the adjudication of a $5,000.00 credit to USAA for medical payments benefits paid to Ms. Howard by State Farm. We also amend the language of the November 14, 2013 judgment, to specify that the remaining $10,000.00 credit is awarded only insofar as the judgment was in excess of USAA’s policy limits; and, as amended, affirm in part. We further amend the March 5, 2014 judgment, to award Mr. Howard $3,000.00 for loss of consortium; and, as amended, affirm that judgment.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
It is undisputed that on August 10, 2009, a vehicle driven by Ms. Greenup rear-ended a vehicle driven by Ms. Howard. At the time of this appeal, it is also undisputed that Ms. Greenup was 100 percent at fault in causing the accident. The issues on appeal concern causation of injuries, quantum, and certain pretrial rulings by the district court. •
At the time of the accident, Ms. Greenup was insured by USAA with policy limits of $25,000.00; and Ms. Howard had UM coverage through a State Farm policy with limits of | <¡$10,000.00. At the time of the trial, Ms. Howard had received from State Farm her UM policy limits of $10,000.00 and medical payments benefits of $5,000.00, but plaintiffs had received no payments from USAA.
In a petition for damages filed August 9, 2010, plaintiffs alleged that as a result of the accident,-Ms..Howard sustained serious injuries to her neck, back, and head that necessitated surgical intervention and would require future medical treatment.[1] *390 In a pretrial order, the defendants stated their intent to stipulate to Ms. Greenup’s liability for the accident, but specifically reserved all rights to defend against the personal injury claims of plaintiffs on the basis of causation and extent of injury. In that same pretrial order, USAA asserted that it had offered to settle plaintiffs’ claims “on numerous occasions” for its policy limits of $25,000.00, but that plaintiffs refused to accept the tender and release Ms. Greenup; thus, the matter proceeded to trial.
Prior to the jury trial on the merits, the defendants filed a- motion to adjudicate credits, asserting that any judgment that may be cast against them in excess of its policy limits should be reduced by $15,000.00, the amount recovered by plaintiffs in the pretrial settlement with State Farm. In support of this claim, USAA attached a letter from State Farm to counsel for USAA, confirming that State Farm would not pursue any Rights to subrogation of the payments it made to plaintiffs. USAA also argued that the credit was not prohibited by the collateral, source rule since State Farm and USAA are solidary obligors and the victim is not entitled to a windfall resulting from payments by soli-dary obligors.
Also, prior to trial, USAA filed a peremptory exception raising the objections of no right and/or no cause of action as to plaintiffs’ claims against it for statutory penalties and attorney fees pursuant to La. R.S. 22:1892 and 22:1973. USAA alleged that those “bad faith” penalty statutes are inapplicable to it, a third-party claim defendant.
I/The district court agreed with defendants on both issues, and by judgment dated November 14, 2013, sustained the exceptions, dismissing the. “bad faith” claims, and granted the motion to adjudicate a credit of $15,000.00 in favor of USAA and Ms. Greenup to any judgment awarded in favor of plaintiffs.
At the close of plaintiffs’ presentation of their case at trial, defendants moved for a directed verdict, seeking dismissal of all of plaintiffs’ claims for future damages, both physical pain and suffering and medical expenses, based on their assertion that plaintiffs had failed to prove the probability of any such future damages or any need for future treatment. Subject to plaintiffs’ objection, the district court granted the motion and dismissed all claims for future damages. (Plaintiffs proffered the testimony of Dr. Sean K. Graham to preserve the issue of future damages and/or treatment for review on appeal.)
Following the-three-day trial, the jury awarded Ms. Howard a total of $42,000.00. The verdict consisted of an award of $30,000.00 for past medical expenses, $2,500.00 for past lost wages, and $9,500.00 in general ■ damages. The jury rejected Mr. Howard’s claim for loss of consortium damages. The final judgment rendered by the district court provided that the jury award of $42,000.00 was subject to a credit in the amount of $15,000.00 (payments received by plaintiffs from their State Farm policy), resulting in a total award to plaintiffs of $27,000,00, subject to applicable policy limits. The judgment further specified that the defendants (Ms. Greenup and USAA) were liable in solido for $25,000.00 of the award, together with legal interest, expert witness fees of $5,000.00, and costs of the proceedings;- and Ms. Greenup was assessed with sole liability for the addition *391 al $2,000.00, which resulted in a net award to plaintiffs of $27,000.00.
THE APPEAL
On appeal, plaintiffs assert eleven assignments of error, the majority, of which challenge the amount of quantum. Plaintiffs argue that the amounts awarded by the jury were abusively low in light of the evidence presented. - Additionally, plaintiffs assign error to .the rulings of the district court disallowing their claims for future damages, as well as dismissing their claims for penalties and allowing defendants a credit for the $15,000.00 Rpaid by plaintiffs’ UM carrier. Finally, plaintiffs assert that no evidence of “applicable policy limits” was introduced by USAA; thus, they assign error to the district court’s failure to cast the defendants liable in solidó for the full amount of the judgment.
EVIDENCE PRESENTED
At trial, Ms. Howard testified, as did her husband, her sister, several co-workers, one treating physician, Dr. Sean K. Graham (an interventional pain management physician at the Spine Diagnostic & Pain Treatment Center), and defendant, Ms. Greenup. Plaintiffs also introduced into evidence Ms. Howard’s medical records and photographs of both vehicles involved in the accident.
-Notably, and as discussed in more detail below, the record reveals, in several places, that Ms. Howard’s version of her medical history (predating the accident) and the injuries she related to the accident were inconsistent when compared with her medical- records. Most significantly, Ms. Howard claimed that as a result of this automobile accident, she developed migraine headaches and also suffered from depression and anxiety. She denied ever having these symptoms prior to the accident. However, her medical records reveal a long-standing history of migraine headaches, for which she was prescribed and took pain medication, long before the accident. Her medical records also reveal that she had a history of depression and anxiety, also predating the accident, for which she, was also prescribed and took medication. .Furthermore, there are several significant gaps in Ms. Howard’s medical history after the accident when .she did not seek any treatment at all, and during which, time she was presumably pain and symptom free.
The medical records indicate that Ms. Howard was taken by ambulance from the accident scene to the emergency room at Our Lady of .the Lake Regional Medical, Center (OLOL). Upon arrival, she complained of neck pain, headache, nausea, and ringing in her ears. She was given medication for the pain and nausea. A1-. though .Ms. Howard testified at trial that the doctors at OLOL told her that her vertebrae “was misaligned,” the results of the CT scan of the cervical spine and cervical spine x-rays taken at OLOL revealed .no abnormalities, no fractures, “normal disc spaces,” and indicated only “[mjinimal ^degenerative change at C4-5.” Moreover, Ms. Howard was discharged hours later with the diagnosis of neck sprain secondary to a motor vehicle accident. Her discharge instructions specifically noted “No Serious Injury” and that Ms. Howard was being prescribed a heating pad for her neck every 3-4 hours as needed and pain and muscle spasm medications to be taken as needed. She was also advised to seek follow-up care from her personal primary care physician.
Ms. Howard went to s,ee her primary care physician,, Dr, Thomas Perkins, the following day,. complaining of neck and head pain.- Dr, Perkins’ records denote no documentation of objective injuries;. however, he referred her to physical therapy *392 for the neck sprain. Notably, Dr. Perkins’ medical records that predate the accident reveal documentation of a history of migraine headaches as well as a long history of depression and anxiety, for which he had treated her and prescribed medication.
Ms. Howard began physical therapy on August 19, 2009. Those records reveal that she had signs and symptoms consistent with cervical sprain/strain. She attended physical therapy for a total of twenty sessions. On her last visit, October 2, 2009, a discharge summary reveals that she had full range of motion and that all her therapy goals had-been met.
Notwithstanding her successful discharge from physical therapy, Ms. Howard continued to complain of neck pain and headaches, and she sought treatment at the Spine Diagnostic & Treatment Center, where she first treated with Dr. Adair, a pain management specialist. While being treated at the center, she had two epidural steroid injections, one on November 11, 2009, and another on December 2, 2009. She received some relief from the injections, and she continued to take pain medications, for headaches, as well as muscle relaxers and anti-inflammatory medications. At her follow-up visit with Dr. Adair on December 15, 2009, she reported a 50 percent improvement of her neck pain and no complaints of headaches.
However, three months later, Ms. Howard returned to Dr. Adair, with complaints of returning neck pain and headaches. At this time, Dr. Adair referred her to |7Pr. Waguespack, a neurosurgeon at the Neu-roMedical Center, whom she saw on April 19, 2010. ' Dr. Waguespack referred her for an MRI of the cervical spine, the results of which were normal. Contrary to Ms. Howard’s testimony that she was told she was a candidate for future surgery, Dr. Waguespack’s records reveal that he did not find her to be a candidate for surgery. Instead, because there was no “injury” to treat, Dr. Waguespack released Ms. Howard and referred her back to the pain management facility in May 2010.
When she returned to the Spine Diagnostic & Treatment Center, Ms. Howard was seen by Dr. Turnispeed. The medical records reveal that he referred her for a dorsal medial branch block, which was performed on June 10,2010. After that block, Ms. Howard claimed to have no neck pain. At a' follow-up appointment, on July 1, 2010, Dr. Turnispeed performed a “cervical radio frequency neurotomy/ablation at the C3-4 and C4-5 levels. When Ms. Howard presented for follow-up treatment after that procedure, she claimed she had achieved complete relief of all pain symptoms and was not taking pain medications for either her neck or head. Her examination that date also was normal.
She subsequently returned for follow-up, and was treated by Dr. Sean Graham, the only physician who testified at trial. At her first visit with Dr. Graham, on August 17, 2010, she reported she was doing very well; she had stopped all of her medications, and had no headaches. She saw Dr. Graham again in October 2010, reporting that the headaches were still gone, but she was having a burning pain along the shoulder blade and the back of her neck. Dr. Graham opined this pain was the result of inflammation of the nerve (from the ablation procedure), and he prescribed anti-inflammatory medication. When she saw Dr. Graham in November 2010, she reported the burning pain in the neck and shoulder had completely resolved. She returned in. February 2011 and reported that she was much better, and had quit all medications with the exception of the occasional use of a topical anti-inflammatory cream for muscle spasms, as needed.
In August 2011, she went back to see Dr. Graham, complaining that for “un *393 known reasons” she was again having pain in her shoulder and neck. Dr. Graham administered another trigger point injection on September 7, 2011, and added a muscle relaxer |smedication. He opined that the recurrence of her pain was indicative of nerve irritation at the site of the ablation. On November 2, 2011, he gave her another epidural steroid injection and referred her back to physical therapy. The last time Dr. Graham saw her was in December 2012, when she reported that she was much better. At the time of trial, it had been two years since Dr. Graham had last treated Ms. Howard, and at that time she was completely pain free. Dr. Graham testified that he was unaware that Ms. Howard had a history of migraine headaches preceding the accident, but noted that a neck sprain, such as the one Ms. Howard sustained as the result of being rear-ended, could cause the exacerbation of preexisting migraines. He also admitted that the muscle spasms in her neck of which she complained could also be the result of stress and depression, which also predated the accident.
During Dr. Graham’s testimony, the defendants objected to Dr. Graham testifying regarding the potential for Ms. Howard to suffer future medical problems and to incur future expenses. The district court sustained the objection, following which Dr. Graham’s testimony as to that issue was proffered. Plaintiffs assign error to the trial court’s ruling, and this will be addressed later herein.
Even Ms. Howard admitted during her testimony at trial that since June 2012, she felt completely pain free, had no headaches, and had returned to work and was functioning normally, without any problems or limitations. During her testimony, Ms. Howard stated that in her previous deposition, she denied that she ever had a history of migraine headaches, and maintained that she could not remember ever having been treated for such. Also, when presented with her prior medical records, she agreed that she had been treated for depression and anxiety, but stated that was because she was “mad” all of the time. She offered no other explanation for her continued use of antidepressants and anti-anxiety medications prior to the accident.
The record also contains the testimony of Ms. Howard’s husband, her sister, and several co-workers, each of whom relayed the same complaints Ms. Howard testified to regarding the post-accident pain she experienced in her neck and head.
^QUANTUM
SPECIAL DAMAGES (PAST MEDICAL EXPENSES AND LOST WAGES)
Assignments of error numbers one and two concern special damages: plaintiffs assert that the jury erred in awarding only $30,000.00 for past medical expenses, when the uncontroverted evidence established that her past medical bills totaled $49,213.72. Plaintiffs also assign error to the jury’s award of only $2,500.00 for lost wages, when the uncontroverted evidence established that her loss of earnings totaled $5,806.50.
When claims for accrued (past) medical expenses are supported by medical bills, these expenses should be awarded unless there is contradictory evidence or reasonable suspicion that the bills are unrelated to the defendant’s negligence. Ketchum v. Roberts, 2012-1885, p. 7, 2014 WL 3510694 (La.App. 1 Cir. 5/29/14) (unpublished opinion).
To recover for actual wage loss, plaintiff must prove that she would have' been earning wages but for the accident in question. Boyette v. United Services Auto. Assoc., 2000-1918 (La.4/3/01), 783 *394 So.2d 1276, 1279. It is the plaintiffs burden to prove past lost earnings and the length of time missed from work due to the accident. The fact finder is accorded broad discretion in assessing awards for lost earnings, and.there must be a factual basis in the record for the award. However, an award for lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. Lemoine v. Mike Munna, L.L.C., 2013-2187 (La.App. 1 Cir. 6/6/14), 148 So.3d 205, 212.
GENERAL DAMAGES
In assignments of error numbers three, four, and five, plaintiffs challenge the amount of general damages awarded by the jury to Ms. Howard for her injuries. Plaintiffs assert the general damage award of $5,000.00 for physical pain and suffering, the $2,500.00 award for mental anguish, and distress, and the $2,000.00 award for loss of enjoyment of life’ were abusively low. Additionally, in assignment of error number seven, plaintiffs claim the jury erred in failing to award Mr. Howard anything for loss, of | ^consortium,1 love, and society with his wife, as a result of the injuries she suffered in the accident at issue.
 The assessment of “quantum,” or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. The abuse of discretion standard of review applies when an appellate court examines a fact finder’s award of general damages. Mack v. Imperial Fire and Cas. Ins. Co., 2014-0597, p. 7 (La.App. 1 Cir. 11/7/14), 167 So.3d 691.
These alleged errors involve the calculation of damages and the credibility and weight given by the fact finder to the testimony of the witnesses and evidence presented. - General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. The factors to be considered in assessing quantum of damages for pain and suffering, are severity and duration. Ketchum v. Roberts, 2012-1885 at p. 8.
CAUSATION OF DAMAGES
When causation of damages is also an issue, however, in order to reverse a factual determination by the trier of fact, the appellate court applies a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through DOTD, 617 So.2d 880, 882 (La.1993). Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. at 883. Moreover, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. The plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.
[t1A tortfeasor is liable only for damages caused by his negligent act. He is not liable for damages caused by separate, independent or intervening causes. Hence, the plaintiff has the burden of proving that her injuries were not the result of separate, independent, and inter *395 vening causes. Broussard v. Razden, 982576 (La.App. 1 Cir. 12/28/99), 763 So.2d 644, 652.
DISCUSSION/ANALYSIS
PAST MEDICAL EXPENSES, LOST WAGES, GENERAL DAMAGES, AND LOSS OF CONSORTIUM (ASSIGNMENTS OF ERROR ONE THROUGH FIVE, AND SEVEN)
Throughout this litigation, the defendants challenged the nature, cause, and the extent of Ms. Howard’s injuries. Thus, the jury’s findings wei’e- factual' and based largely on credibility determinations and observations of the physical demeanor of the witnesses. Applying the two-part test required of this court, we find a reasonable factual basis in the record for the jury’s decision to award only part of the damages claimed by Ms. Howard.
Notably, on the date of the accident; OLOL’s medical records reveal no documentation of any objective injury, and Ms. Howard was discharged the same day with a cervical sprain. The reasonable factual basis in the record also consists of the aforementioned inconsistencies in Ms. Howard’s testimony regarding the lack of prior headaches and depression and anxiety, when the medical records clearly reveal a longstanding history of those symptoms predating the accident. Moreover, and as also noted earlier, . there were numerous discrepancies between Ms. Howard’s trial testimony and the corresponding medical records — the most significant of which was her testimony that she would need future treatment and was a surgical candidate, directly contradicting the medical records of her neurosurgeon, Dr. Wag-uespack, which revealed a normal MRI of the cervical spine and indicated that there was no injury to treat.
The record also reveals several gaps in Ms. Howard’s medical treatments, during which times she was pain and symptom free. Indeed, at her August 17, 2010 follow-up appointment with the pain management specialist, approximately one year after the accident, and some months after the branch block and the ablation, she reported a | ^complete relief of all pain and that she was not taking any medications. Additionally, at her few follow-up appointments in late 2010 and early 2011, she continued to report that she was symptom free and happy that all her pain had resolved. Finally, as earlier noted, she last saw a physician for treatment more than two years prior to trial, at which time she, again, reported that she was completely symptom free.
With regard to her credibility, the record reveals that Ms. Howard was less than forthcoming regarding her pre-accident, long-standing history of migraine headaches. Further, although she claimed that the accident caused her depression, stress, and anxiety, she was also less than forthcoming about her preexisting need for medications for depression and anxiety, which she said were prescribed for anger. Instead, the medical records revealed that she had been treated for at least six years with antidepressants due to stresses at work; and just one month prior to the accident, .she had another prescription filled for depression and emotional distress.
All of the foregoing provides a reasonable factual basis in the record to support our affirming the jury’s rejection of Ms. Howard’s claims that she suffered “permanent injury” as a result of the accident for which, she would require future treatment and medications. In fact, it seems- apparent that the .jury reasonably found that, although Ms. Howard did suffer a neck sprain as a result of the acci *396 dent, the pain and symptoms related to that injury were short-lived and completely resolved long before the trial. Based on the evidence presented, the jury is permitted to award less than all of the past medical expenses and general damages claimed if the jury believes that some, but not all, of the claims were caused by the accident. See Wainwright v. Fontenot, 2000-0492 (La.10/17/00), 774 So.2d 70, 77-78. Based on the record before us, we find no manifest error in the jury’s determination that Ms. Howard was entitled to some, but not all, of her claimed pain and suffering damages, medical expenses, and lost wages. Accordingly, we find no merit in assignments of error numbers one through five.
However, while finding that Ms. Howard was injured as a result of the accident, to a certain degree and for a shorter duration than claimed, and for which the verdict 113awarded her damages, the jury awarded no loss of consortium damages to Mr. Howard. On this issue, the record contains the following evidence. At the time of the accident, Mr. and Ms. Howard had only been married two years. While recognizing that the jury obviously found Ms. Howard to be less than fully credible, the testimony of Mr. Howard was not refuted or contradicted in any way. (Indeed, his testimony was, in part, corroborated by both Ms. Howard and her sister, Nicole Perrett.) Ms. Howard testified that during the months she was laid up in bed from the neck pain and headaches, it was her husband who had to take over the housekeeping chores, as well as the care of her two children from a prior marriage. She also was unable to enjoy things they frequently did as a couple prior to the accident, such as, riding four-wheelers and fishing; and they had to cancel a planned vacation. Ms. Howard’s sister also testified that Ms. Howard told her that her condition of being laid up for several months after the accident placed both an emotional toll on her relationship with her husband and created financial stress in their marriage.
Mr. Howard’s testimony was forthright and uncontroverted. He confirmed that the injuries his wife sustained in the accident and the consequences thereof, including medical bills, placed financial stress on their marriage and became something about which they were always fighting. He further stated that prior to the accident, he and his wife enjoyed weekend outings (such as, flea market shopping, fishing, taking “day trips” to historic sites and shopping for antiques, and other outdoor activities to get them out of the house), but they were unable to do any of that for the several months that she was suffering from the neck pain and headaches. He testified they had to cancel planned family trips at Thanksgiving and Christmas that year. He also divulged that prior to the accident, they had sexual relations multiple times a week, but after the accident, their “sexual relationship went downhill,” and that they even sought help from a marriage counselor a few times to try and resolve some of those issues. He further explained that because of the rising costs of the medical bills, he had to take a job working “second shift” that caused them to be apart most of the week. He testified [ 14that being unable to do things with his wife took out all the enjoyment of any of those activities, and that “it stressed [him] out” not being able to go anywhere. He further testified to the difficulties he had trying to step in for his wife as a “stepdad” insofar as helping the boys with school work and disciplining them, which caused a lot of stress between himself and the boys, as well as with his wife. He stated that taking over all of the household chores put a real strain on him, partieulaiiy since he had to work six days a week, due to the increasing medical bills. *397 Finally, he admitted that he was constantly worried about' his wife while he was at work and unable to be with her when she was in pain.
In reviewing an award for loss of consortium, it is necessary to evaluate the elements that compromise a loss of consortium claim. “Consortium” means much more than sexual relations. The term also includes love and affection, society and companionship, support, aid and assistance, felicity, and performance of material services; e.g., uncompensated .work around the home. See La. C.C. art. 2315.. Proof of any one of these components is sufficient for an award of consortium. Additionally, a loss of consortium award is a fact-specific determination to be decided on a case-by-case basis and is disturbed only if there is a clear abuse of discretion. Lemoine v. Mike Munna, L.L.C., 148 So.3d at 214.
Although the jury was well within its discretion in choosing to believe that Ms. Howard was not injured to the extent that she claimed, it did find some injury, for a short duration, and compensated her for that injury. In light of .this, and the un-controverted evidence in the record regarding the impact Ms. Howard’s injury had on Mr. Howard, we are, constrained to find that the jury clearly, abused its discretion in refusing to award any damages for Mr. Howard for his evident loss of consortium. Given the jury’s findings regarding the actual severity and duration of Ms. Howard’s injuries that were caused by the accident, we find an award of $3,000.00 is appropriate for his loss of consortium. Therefore, we amend the final judgment to add this damage award.
JjgFUTURE DAMAGES (ASSIGNMENTS OF ERROR SIX AND EIGHT)
In assignments of error numbers six and eight, plaintiffs allege the district court erred in- granting the defendants’ motion for directed verdict on claims for future medical expenses, thus, not allowing them the right to claim general damages for Ms. Howard’s future pain and suffering, mental anguish and distress. They further argue the district court erred by disallowing Dr. Graham, as the treating pain management expert, to testify regarding Ms. Howard’s need for future damages, finding him to be unqualified to render that kind of testimony.
Future medical expenses will not be awarded in the absence of medical testimony establishing by a preponderance of the evidence that they are indicated in setting out their probable cost. In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Levy v. Bayou Indus. Maintenance Services, Inc., 2003-0037, p. 8 (La.App. 1 Cir. 9/26/03), 855 So.2d 968, 975, writs denied, 2003-3161 (La.2/6/04), 865 So.2d 724, 2003-3200 (La.2/6/04), 865 So.2d 727. An award of future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost. Jenkins v. State ex rel. DOTD, 2006-1804, p. 43 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 776, writ denied, 2008-2471 (La.12/19/08), 996 So.2d 1133.
As to Ms. Howard’s alleged future pain and suffering, mental anguish and distress, those are general damages and the law as stated above applies to. those claims. Future medical expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of an injury. The proper standard for determin *398 ing whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses will be medically necessary. An award of future medical expenses .is justified if there is medical testimony that they are indicated and that sets out their probable cost. Ketchum v. Roberts, 2012-1885 at p. 7.
As noted earlier, plaintiffs at trial produced only one medical expert — interven-tional pain management specialist — Dr. Sean Graham. When counsel began | ^questioning Dr. Graham regarding his opinion of any,future treatment Ms. Howard may need, the defendants objected on the basis that the evidence presented established that Ms. Howard’s injury was fully resolved and there was no evidence presented to indicate that Ms. Howard would suffer any future pain and suffering or incur any future medical expenses for the cervical sprain sustained in the accident. Additionally, defendants objected on the basis that Dr. Graham, as a pain management specialist, was not qualified to testify as to any need for future treatment. The district court sustained the objection, stating that a pain management specialist treats pain and resolves the symptoms or refers a patient to another specialist. The district court further noted that a neurosurgeon or an orthopedic surgeon would be the proper qualified expert to render an opinion regarding the prognosis of an underlying injury.
Generally, the fact that a medical doctor is not a specialist in a particular field upon which he is called to testify applies only to the effect on the weight to be given such testimony, not to its admissibility. Hunter v. Bossier Medical Center, 31-026 (La.App. 2 Cir. 9/25/98), 718 So.2d 636, 644 (where the court found it was not error for the trial court to allow a general surgeon testify as to an orthopedic procedure). See also Hubbard v. State, 2002-1654 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1104-1105, writ denied, 2003-2818 (La.12/19/03), 861 So.2d 579 (where the court found it was not manifest error to allow an economist testify regarding medical economics).
During his trial testimony, Dr. Graham admitted that as a pain management specialist, he relies wholly on the medical history and symptoms as -presented to him by the patient. He further admitted that he treated Ms. Howard based on what she relayed to him and that he did not review any of her prior medical records or the previous diagnostic tests (x-rays, CT sean, and MRI of her cervical Spine). When shown the x-rays taken at OLOL on the date of the accident, he agreed those showed degenerative changes at the same level where the disc bulge was evident on the MRI. Further, he agreed that the diagnostic report by Dr. Waguespack revealed a normal CT scan. He also admitted that Ms. Howard never reported to him that she had a long-standing history of migraine headaches, or that she 'had taken medications for migraines long before the accident at issue. He further agreed that migraine headaches as well as stress can cause symptoms of the neck such as pain and muscle spasms. As noted earlier, he also admitted that he did not see Ms. Howard until a year after the accident, and that the last time he saw her, which was two years before the trial, she reported to him that she was pain and symptom free.
However, more significantly, during Dr. Graham’s proffered testimony concerning future medical treatment, he testified “[p]ain related ■ to those facet joints are common after a motor vehicle accidente,] but once everything is back to normal for as long as it’s- (sic) been[,] I do not think that those symptoms are going to return *399 and I don’t think that she’s going to need further cervical radiofrequency (sic) procedures.” He did opine that she may have recurrences of discogenic pain from the disc bulge, but as noted. earlier, he also agreed- that it was a degenerative condition, not caused by the accident at issue. Finally, he admitted that his testimony regarding any future treatment she may need for the disc pain was “purely based on the typical, natural history of the patients I’ve seen” and not specific as to Ms. Howard.
Thus, even if we were to find that the district court erred in disallowing Dr. Gráham’s testimony ás to future'damages, básed on our’ review óf his proffered testimony, we find the error to be harmless, because that testimony did not establish that more probable than not, Ms. Howard would suffer any future pain or need future treatment for the injury sustained as a result of the accident at issue.
Accordingly, we find no merit in assignments of error numbers six and eight.
STATUTORY PENALTIES . (ASSIGNMENT OF ERROR NINE)
Plaintiffs also contend the district court erred in denying their right to claim statutory penalties against USAA for failing to adjust and timely pay Ms. Howard’s medical bills, pursuant to La. R.S. 22:1892 and R:S. 22:1973.” In its pretrial November 14, 2013 judgment, the court dismissed with prejudice those claims by plaintiffs, adopting the arguments set forth by thé defendants in brief as its reasons. We find no error.
|1sAs correctly argued by the defendants, claims for penalties and attorneys’ fees for the failure, to tender policy limits under La. R.S. 22:1892 and 22:1973 are commonly referred to as “bad faith” claims, - which apply only to first party medical pay issues. USAA insured Ms. Greenup, the tortfeasor in this matter; it did nqt insure plaintiffs. Thus, plaintiffs are third party claimants vis-d-vis USAA and the “bad faith” statutes are simply inapplicable. Plaintiffs do not fall within the category of individuals who can bring a “bad faith handling of a claim” cause of action against USAA, with whom plaintiffs have no contractual relationship. As stated by the supreme court in Langsford v. Flattman, 2003-0189 (La.1/21/04), 864 So.2d 149, “[t]he relationship between the insurer and the third party claimant is neither fiduciary nor contractual; it is fundamentally adversarial. For that reason,' a cause of action directly in favor of a third party claimant is generally not recognized absent statutory creation.” Id. at 151; see also Mathies v. Blanchard, 2006-0559 (La.App. 1 Cir. 2/21/07), 959 So.2d 986, 988-989.
Additionally, La. R.S. 22:1892 and 22:1973 are penal in nature and strictly construed. Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104, 1130. There is no. construction of these statutes that would render them applicable to plaintiffs’ claims against the tortfeasor’s insurer.
Accordingly,, we find no error and no merit to assignment of error number nine.
CREDIT (ASSIGNMENT OF ERROR TEN)
Plaintiffs further claim the district court erred in giving defendants a $15,000.00 credit for the sums received by Ms. Howard from State Farm, her UM insurer. As previously noted, prior to trial State Farm paid Ms. Howard medical payments benefits in the amount of $5,000.00 and UM policy limits in the amount of $10,000.00. The issue of whether a credit is warranted is strictly a matter of law, subject to a de novo review by this court. See *400 Johnson v. Johnson, 2014-0564, (La.App. 1 Cir. 12/23/14), 168 So.3d 641.
Prior to trial, defendants filed a motion asserting that any judgment that may be cast against them in excess of USAA’s policy limits entitled them to a credit in the total | ^amount ($15,000.00) of plaintiffs’ pretrial settlement with their UM insurer. Attached to their motion, defendants provided a letter by a State Farm claim representative, informing them that State Farm had no intention of pursuing recovery of the amounts paid to plaintiffs, thus, waiving any right of subrogation it may have against any other party liable for plaintiffs’ damages. Moreover, defendants contend that the collateral source rule prohibits the victim to receive a windfall as a result of payments made by a solidary obligor.
After a hearing, the district court, in the November 14, 2013 judgment, awarded the defendants a credit against “any judgment awarded herein in favor of plaintiffs” for any amounts paid out by State Farm. (Emphasis added.) For the reasons that follow, we find the district court erred in granting the $5,000.00 credit for the medical payments benefits, and reverse that portion of the judgment. Further, although we find the district court did not err in awarding the $10,000.00 credit against the damages awarded plaintiffs by the jury’s verdict, we find the district court failed to specify that the credit awarded applied only to any judgment awarded in excess of USAA’s policy limits. In order to recover from a UM insurer, there must first be a determination that the tortfeasor was liable for damages in an amount in excess of the tortfeasor’s liability insurance policy. Kelley v. General Ins. Co. of America, 2014-0180 (La.App. 1 Cir. 12/23/14), 168 So.3d 528 (Pettigrew, J. concurring); see also, Rizer v. American Sur. & Fid. Ins. Co., 95-1200 (La.3/8/96), 669 So.2d 387, 390. Thus, in that regard, the November 14, 2013 judgment is amended.
As to the $10,000.00 credit allowed for the UM policy limits, the case of Fertitta v. Allstate Ins. Co., 462 So.2d 159, 161 (La.1985), is directly on point, and we are constrained to follow it. The court in Fer-titta addressed the issue of “whether the tort victim’s judgment against the tortfea-sor for the full amount of the victim’s damages should be reduced by the amount of the victim’s pretrial settlement with his UM carrier, when the latter, as part of the settlement, has waived any right of reimbursement or subrogation.” The supreme court held that such credit was due to any award in excess of the tortfeasor’s insurer’s policy limits, reaffirming its earlier holding in Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982), that the victim’s, uninsured motorist carrier is solidarity liable with the tortfeasor because both obligors are obliged to the samé thing so that each obligor may be compelled for the whole. Fertitta, 462 So.2d at 162. Further citing Hoefly, the court reiterated that “the underlying purpose of both delictual responsibility and uninsured motorist coverage is to promote and effectuate complete reparation, no more and no less.” Fertitta, 462 So.2d at 162. (Emphasis in original.)
As in Fertitta, in this matter, the tortfeasor’s liability covei'age (USAA’s policy limits of $25,000.00) is less than the amount of damages awarded to plaintiffs. Thus, both, State Farm and Ms. Greenup (and her insurer, USAA) were legally bound by separate provisions of law to repair plaintiffs’ damages in the amount that those damages exceeded the limits of Ms. Greenup’s liability policy, despite the independent sources of liability. When the liability is solidary, the creditor (plaintiffs) cannot collect more than the full amount of *401 the debt for the single or combined payments of the debtors, such that solidarity is not inconsistent with the purpose of providing full recovery to the tort victim. Id. at p. 163. Accordingly, the district court did not err in awarding $10,000.00 as a credit.
However, although the plaintiffs argue on appeal that the entire $15,000.00 credit was erroneously granted (and they did not differentiate between the $5,000.00 medical payments benefits and ■ the $10,000.00 UM policy limits), we find that a distinction exists that prohibits granting a credit for medical payments, because such credit violates the collateral source rule. See Johnston v. Shelton, 42,103 (La.App. 2 Cir. 6/27/07), 961 So.2d 582, 587 (holding that medical payments to accident victims under car owner’s policy did not entitle tortfeasor’s liability insurer to credit because the payments were from a collateral source). (Emphasis added.) Even the Fertitta court noted that in the case of medical payments, because only the com tract (and not the law) imposes the obligation on the insurer to repair some of the damages caused by the tortfeasor, there arguably is no solidary liability. Fertitta, 462 So.2d at 164 n. 7. The insured must specifically request that coverage, and medical payment and collision insurers are contractually liable for any |21medical expenses or collision damages, notwithstanding that those expenses and damages were caused by a tortfeasor and not the insured.[2] Accordingly, we find the $5,000.00 credit was prohibited ■ by the collateral source rule, and we reverse that portion of the November 14, 2013 judgment. See La. C.C.P. art. 2164 (providing that the appellate court shall render any judgment which is just, legal, and proper upon the record on appeal).
IN SOLIDO LIABILITY (ASSIGNMENT OF . ERROR ELEVEN)
Finally, plaintiffs claim the district court erred in failing to order USAA liable in solido with Ms. Greenup for the entire amount of the award, “since no evidence of ‘applicable policy limits’ was introduced by” USAA. This assignment of error led to the filing in this court by the defendants of a motion to supplement the record with the declarations page of the USAA policy on the basis that it had, indeed, been introduced as á joint exhibit at trial. Defendants’ counsel represented that when the appellate record was reviewed by her, she noticed that page 5 of the policy (the declarations page) had been redacted by plaintiffs’ counsel when the joint exhibit was filed into the record.,. She asserted that she became aware of the missing page in the exhibit when she checked the appellate record. Plaintiffs then filed a motion to strike, asserting among other things, that the motion to supplement was handled ex parte. This court issued an order, remanding the matter to the district court *402 for the limited purpose of holding a contradictory hearing on the issue of whether the declarations page of the USAA policy had been properly introduced and made part of the record subject to review by this court.-
The record was then supplemented with the transcript of the contradictory hearing that was held, together with the district court’s ruling maintaining its original decision to 122allow supplementation of the record with the missing declarations page. The district court distinctly recalled the introduction of the joint exhibit, and also distinctly recalled reviewing said exhibit at the time it was introduced into the record, and at that time, it included the declarations page of the policy. We have reviewed the transcript of the contradictory hearing in its entirety, and find no 'error in the district court’s ruling, finding its recollection not only credible, but also supported by the transcript of the trial when the joint exhibit was introduced. For these reasons, we deny the motion to strike and affirm the district court’s original ruling allowing supplementation of the record. As supplemented, the record renders plaintiffs’ assignment of error regarding the district court’s failure to find USAA liable in solido with- Ms. Greenup (the tortfeasor) for the amount of the judgment in excess of USAA’s ■ policy limits ($2,000.00) meritless.
Accordingly, this assignment of error has no merit.
CONCLUSION
For all of the foregoing reasons, we reverse $5,000.00 of the credit awarded to USAA and we amend the district court’s November 14, 2018 judgment to specify the $10,000.00 credit is awarded only insofar as the judgment was in excess of USAA’s policy limits; we amend the district court’s March 5, 2014 judgment to include an award to Mr. Howard for his loss of consortium in the amount of $8,000.00; in all other respects, both judgments are affirmed as amended.
NOVEMBER 14, 2013 JUDGMENT REVERSED IN PART, AMENDED IN PART; AND AFFIRMED IN PART AS AMENDED; MARCH 5, 2014 JUDGMENT AMENDED IN PART; AND AFFIRMED AS AMENDED.
WELCH, J., concurs and assigns reasons.

. In addition to Ms. Greenup and USAA, plaintiffs also originally named as defendant State Farm, which paid its limits under its policy to Ms. Howard, resulting in its dismissal with prejudice, by judgment dated November 29, 2010. Plaintiffs also named as defendant the East Baton Rouge Parish .School Board, which was dismissed with prejudice *390 by judgment dated December 20, 2011, granting its unopposed motion for summary judgment on the basis that plaintiffs could not prove that Ms. Greenup was in the course and scope of her employment with the school board at the time of the accident.

. Accord Kidder v. Boudreaux, 636 So.2d 282, 284 (La.App. 3 Cir. 4/6/94), writs denied, 94- 1150 (La. 10/7/94), 644 So.2d 629, 94-1640 (La.10/7/94), 644 So.2d 630 (Under collateral source rule, tort damages awarded to woman injured when she was rear-ended by pickup truck were not subject to reduction for medical payments made to woman by her own underinsured motorist carrier, where carrier did not assert subrogation right, carrier and woman did not enter into subrogation agreement, and carrier was not contractually sub-rogated under policy to rights of woman to extent of medical payments made). See also Arcemont v. Voisin, 468 So.2d 785, 794 (La.App. 1 Cir.), writ denied, 474 So.2d 947 (La.1985) (No credit was due to insurer against whom the court imposed UM coverage (based on an ineffective rejection of UM coverage) for the $13,000 check it tendered to plaintiff under the medical payments coverage of the policy. The collateral source doctrine, well established in Louisiana jurisprudence, bars such credit).