J^GOTHARD, Judge.
Plaintiff, Troy Anthony, filed suit for injuries received in a vehicular accident in which he was injured and his guest passenger was killed[1]. A trial on the merits was had and the jury found that the defendant driver was .negligent with regard to the accident and that the driver’s negligence was a legal cause of the accident. The jury assessed fault to the parties at 70% to defendant and 30% to plaintiff. The jury awarded r damages as follows: physical pain, suffering and disability — $328,800.00; mental pain and ^suffering — $45,800.00; past medical expenses — $30,000.00; future medical expenses — $22,100.00; past lost earnings — $12,000, for a total award of $438,700.00. Defendant filed a motion for judgment notwithstanding the verdict and alternative new trial, which were denied by the trial court. Both defendants and plaintiff filed motions for appeal. For the following reasons we amend the decision to delete the award for past lost wages, and as amended, affirm the decision of the trial court.

FACTS

On or about March 18, 1997, Troy Anthony was operating a Chevy pickup truck, going east on West 10 th Street,'and approaching Airline Highway. Debora Gau-bert was a guest passenger in the truck. When the Chevy truck entered the intersection of West 10 th Street and Airline Highway, it was struck by an 18-wheel Mack dump truck owned by defendant Jackson Service Inc. and operated by defendant Victor Thomas, Jr. Mr. Anthony suffered severe injuries and Ms. Gaubert *204 was killed in the accident. Both drivers allege that they entered the intersection on the green light.
At trial, Mr. Anthony testified that he was traveling on West 10th Street toward Airline Highway at a speed of 30 to 85 miles per hour. His fiancee, Ms. Gaubert, was in the passenger seat. He saw the light at Airline Highway turn green when he was 100 to 200 feet away from the intersection. He also saw the Mack truck, but it looked far enough away that he did not worry that it would run the red light. He entered the intersection and heard Ms. Gaubert scream. When he looked over, all he could see was the grill of [4the Mack truck. The Mack truck hit his truck in the middle of the passenger side.
Mr. Thomas was driving down Airline Highway in an 18-wheel Mack dump truck, proceeding at 35 to 38 miles per hour. The truck was carrying a load of sand and the estimated weight of the truck was 80,000 pounds. Mr. Thomas saw that the light for Airline Highway was red, so he began to slow by easing his foot off the gas pedal; however, he did not apply the brake. He saw the light for West 10 th Street turn yellow, so he knew his light was about to turn green. He started to accelerate. Mr. Thomas saw the pickup truck go in front of him, and he reached for his horn; however, he was unsure whether he actually blew the horn. Mr. Thomas testified that he did not know whether he tried to veer to the right. He further testified that he did not hit the brakes. He stated that the light had turned green by the time he entered the intersection. His truck struck the pickup truck and landed on top of it.
Trooper Ceasar Taylor investigated the accident. When he arrived he observed that the cab of the Mack truck was on top of the pickup truck. The trailer had separated and tipped over, spilling sand. Measurements established that the Mack truck had moved 169 feet after impact. He was given the name of an eyewitness, Juanita LeBlanc, who had already left the scene. Trooper Taylor took her statement one week later.
Juanita LeBlanc testified at trial that she was driving down Airline Highway and she saw the Mack truck coming from the opposite side. She then saw the Chevy truck approaching, and she estimated that it was going 75 to 100 mph. She saw the Chevy truck get hit in the tail end. She stated | Rthat the light was green for her, so it must have been green for the Mack truck.
Dr. Robert Erlich, a mechanical engineer, was qualified as an expert in accident reconstruction. He considered the skid marks and the length of travel and estimated that Mr. Thomas was going about 50 mph at time of impact, and that the Anthony vehicle was traveling about 30 mph. Dr. Erlich also stated that Mr. Thomas would have been close to the intersection to see the other side’s fight turn yellow. He considered the fight sequence timing and concluded that the fight for Airline Highway was still red when Mr. Thomas entered the intersection. Dr. Er-lich also testified that it was his opinion that Mr. Thomas could have taken evasive action, such as applying his brakes, and that he failed to do so. He based this conclusion on Mr. Thomas’ testimony that he had time to reach for his horn, an action which would have taken one and one quarter second. Dr. Erlich further testified that one quarter of a second was all that was needed to avoid the accident. He also agreed that Mr. Anthony might have had the yellow caution fight when he entered the intersection. Dr. Erlich concluded that Mr. Thomas was at fault in the accident because he was anticipating the green fight, and probably entered the intersection while the light was still red, and because he failed to respond after seeing the pickup truck enter the intersection.
Major Ray Burkhart, a police officer and a consultant in the field of accident reconstruction, was qualified as an expert. He testified that the placement of the fights *205 had changed since the accident so that Mr. Thomas did not need to be up to the intersection to see the yellow light. He also testified that Mr. Anthony could have stopped in the median ground and | (¡avoided the accident. He opined that the cause of the accident was Mr. Anthony’s failure to stop, or failure to yield to the Mack truck, which had the green light. He further stated that the Anthony vehicle was not going very fast at the time of the accident, and was probably traveling around 30 mph.
Dr. Oscar Griffith was qualified as an expert in physics with a specialty in accident reconstruction. He testified that Mr. Anthony could have stopped in the median and avoided this accident.
Mr. Anthony was in his early thirties at the time of the accident. He testified that he saw the truck’s grill in the passenger window immediately before impact. He lost consciousness and when he awoke, he was pinned inside the truck. He spoke to his fiancee, she didn’t answer and he knew she was dead. He could not breathe and he was bleeding from his head and arms. He could not move his legs, and he believed he was paralyzed. Rescue workers had to use a Jaws of Life rescue tool to release him. When he was freed, his pain increased. He was strapped to a board and taken to the hospital. At the hospital, it was discovered that he had broken ribs, a collapsed lung, broken pelvis, back and neck pain, and he needed stitches in his head. He also had an injury to his elbow which required 30 stitches. After he was stabilized at River Parishes Hospital, he was transported to Charity Hospital.
Mr. Anthony testified that he spent ten days in intensive care, and a total of seventeen days in the hospital. He then had to move to his mother’s house and he could not walk for three months. He then started to walk with the aid of crutches," and he went to physical therapy twice a week. By 17September he was able to walk without crutches. Mr. Anthony testified that even after his injuries healed, he continued with neck and back pain. As a result, he sought treatment with Dr. Robert Dale, a chiropractor. His back still continued to hurt, so he went to Charity Hospital where an MRI revealed three herniated discs.
Mr. Anthony testified that, at the time of trial, his neck and lower back still hurt, he has headaches and his arm sometimes goes numb. He would have surgery to alleviate the pain but cannot pay for the surgery. His legs get tired after walking and sitting causes his pelvis and tailbone to hurt.
Mr. Anthony further testified that since the accident, he can no longer play football and basketball with his son, and he could •not do his trade of electrical and air conditioning work, because they involve climbing in and out of attics and carrying things. He has difficulty with driving, and has basically become a “couch potato.” He has difficulty sleeping at night because of the pain. Mr. Anthony had been collecting worker’s compensation for a prior shoulder injury, which involved surgery, when the accident happened.
Dr. Gordon Nutik, an orthopaedic surgeon, testified at trial via video deposition. He examined the plaintiff, on request of defense counsel, on May 13,1998. As part of his examination, he took X-rays of defendant. He concluded that Mr. Anthony had sustained soft tissue injury of the neck and back, and fractures of the ribs and pelvis. His X-rays also reflected some underlying disc degeneration which he felt pre-dated the accident. Subsequent to his examination of plaintiff, he was able to review the MRI that had been taken at Charity Hospital. He found some bony | ¿protuberance, and discs narrowing at the C5-6 and C6-7 level. He also saw a small disc herniation at C6-7, which he stated could possibly be causing Mr. Anthony’s symptoms. Dr. Nutik further stated that if a patient’s symptoms (such as the symptoms experienced by Mr. Anthony) did not improve, surgery would be an option. He also stated that an accident such as the *206 one Mr. Anthony was in could cause an asymptomatic degenerative condition to become symptomatic.
Dr. Charles Murphy, an orthopaedic surgeon, testified that he first treated plaintiff in February of 1996, (one year prior to the accident) for a work related injury in which the plaintiff had dislocated his shoulder, necessitating surgery. Prior to the accident at issue Mr. Anthony had a 20% shoulder disability which translated to a 7% whole body impairment. Dr. Murphy opined that as a result of the shoulder injury, Mr. Anthony was capable of working in the light to light/medium category, at the time of the accident. In June of 1996, plaintiff suffered an injury by electrocution, and in October of 1996 he rein-jured his shoulder falling out of bed. In January of 1997, Mr. Anthony telephoned him complaining of neck soreness and he prescribed medication. Also in late 1996, he was treated at Kenner Regional for back and neck injury. On March 12, 1997, one week before the accident at issue, plaintiff visited Dr. Murphy for a followup, at which time plaintiff told Dr. Murphy that he was being treated by another doctor for a back and neck injury caused by an automobile accident.
Dr. Murphy reviewed the MRI taken of Mr. Anthony in April of 1998, and stated that it presented evidence of mild disc protrusion and degenerative cervical spon-dylosis. He opined that more likely than not, the 19back condition predated the accident. He admitted that he had never treated plaintiff for any back condition pri- or to or subsequent to the accident. He further admitted that the type of accident Mr. Anthony was in could have caused an asymptomatic condition to become symptomatic.
Dr. Robert Dale, a chiropractor, testified that he began treating Mr. Anthony in September of 1997. He observed muscle spasm in neck area, on the back side of the left shoulder area, in the muscles between the shoulder blade and thoracic area, in the lumbosacral area and in both hip rota-tor musculatures. He also observed pain and restriction of movement in the cervical spine, and lower back and pelvic pain, as well as a pelvic imbalance. Dr. Dale diagnosed cervical and lumbosacral sprain/ strain injuries with attendant swelling in both shoulders, both hips and associated muscle spasm. He opined that the March 18, 1997 accident caused the injuries. He administered physical therapy consisting of ultrasound and interferential current, but did not perform any manipulations. Over the course of treatment, plaintiff developed a numbness in his left hand. Dr. Dale treated the plaintiff for three months. He believed plaintiffs prognosis was guarded due to the severity of plaintiffs injuries and the possibility that there had been permanent damage.
At trial, Dr. Dale reviewed the MRI, which had been conducted after termination of treatment and stated that it revealed a left paracentral disc protrusion at C5-6 and another disc protrusion at C6-7, both of which are in the area to cause left arm weakness and numbness. Dr. Dale stated that these findings reflected why his conservative treatment of plaintiff provided no permanent or lasting relief.
IwANALYS/S
On appeal, the defendant alleges that:
1. The jury erred in finding a causal connection between the accident in this case and any neck and back problems plaintiff may have.
2. The jury award for future medical expenses was manifestly erroneous.
3. Whether the jury erred in finding defendant, Victor Thomas, Jr., to be 70% at fault when the evidence clearly indicates that Troy Anthony’s negligence was the sole cause of the accident.
4. The jury award for damages was manifestly erroneous.
5. The jury award for past lost earnings was manifestly erroneous.
6. The judge erred in giving a jury instruction regarding past lost *207 wages when there was no proof of past lost wages.
7. Whether the jury interrogatory form in this case was confusing, unclear and/or misleading as to the legal cause of the accident when the judge failed to define legal cause in his instructions thereby confusing the jury and misleading them to such an extent as to prevent them from doing justice and thereby creating reversible error.
Plaintiff also filed a motion for appeal in the record. In his appeal, plaintiff alleges that:
1. It was error for the jury to assign plaintiff any fault at all and error to make a deduction for the 30% fault assigned by the jury where it was not the cause of the accident.
2. The judged (sic) erred in not submitting the question of scarring to the jury-
3. The judge erred in not submitting the question of future lost wages to the jury.

ANALYSIS

Defendants argue that the trial court erred in the jury interrogatory form presented to the jury, because the form included questions on whether the parties negligence was a “legal” cause of the accident, when legal cause was not defined in the instructions given to the jury. Defendants request that we conduct a de novo review of the record in this case.
The jury interrogatory form provides as follows:

JURY VERDICT INTERROGATORIES

1. Did you find that the defendant, Victor Thomas, Jr., was negligent with regards to this accident?
X Yes _ No
If your answer to question # 1 is “No”, please sign and dates this form and inform the bailiff. If your answer to question # 1 is yes, please proceed to the next question
Was the negligence of the defendant, Victor Thomas, Jr., a legal cause of the accident? 2.
X Yes _ No
3. Do you find that the plaintiff, Troy Anthony, was negligent with regards to this accident?
X Yes _ No
4. Was the negligence of the plaintiff, Troy Anthony, a legal cause of the accident?
_ Yes X No
5. Please assign a percentage of fault to each of the following parties
Victor Thomas _70 %
Troy Anthony _30 %
NOTE: MUST TOTAL 0% OR 100%
|1?.The jury charge given by the trial judge states that:
... you will have to determine if the plaintiff has proved that the defendant has engaged in substandard conduct and is thus, the legal terms, “at fault.” In this particular case, the plaintiff alleges that the defendant has committed the kind of fault which the law calls “negligence.”
The argument advanced by defendants in this case was considered and rejected in Chambers v. Graybiel, 25,840 (La.App. 2 Cir. 6/22/94), 639 So.2d 361; writ denied, 94-1948 (La.10/28/94), 644 So.2d 377. In that case, the trial court included a jury interrogatory that questioned whether a party’s negligence was the “legal cause” of the damages. The court first noted that a special jury interrogatory form should never probe the difficult distinction between “cause in fact” and “legal cause”, because “legal cause” is a legal question of whether a legal standard of care exists to protect a plaintiff against the particular risk of harm. The court then concluded that the use of the words “legal cause” on a jury interrogatory does not cause such confusion:
Ms. Chambers is incorrect, however, in her reading of the instant verdict form. These questions do not ask the jury to differentiate between cause in fact and legal cause of the accident. Rather, they ask for a factual finding of “negligence which was the cause of this acci *208 dent” and then a factual question of whether this negligence was a “legal cause of damages.” This phraseology precisely tracks the language of the Code of Civil Procedure for special verdicts. La.C.C.P. art. 1812C(í)(a). Moreover, the court charged the jury as to “legal cause of any injury and consequent damage the plaintiff may have sustained” in the context of the preexisting condition and the potential comparative negligence ... Taken as a whole, the verdict form and the jury charge adequately explain that in order to find liability, the jury must find that the defendants were negligent and that this negligence caused the damages [ 1scomplained of. American Motorist Ins. Co. v. American Rent-All, [579 So.2d 429 (La.1991) ]. The trial court was not in error to use this verdict form.
Id. at-368.
Defendants argue that the interrogatory answers given by the jury reflect their confusion. This too was addressed in the Chambers case:
We note, nevertheless, an inconsistency in the jury’s responses to the verdict form, properly addressed in Ms. Chambers’s seventh assignment of error. It is obviously illogical to find that neither Thomas Courtney’s nor Jed Graybiel’s negligence caused the plaintiffs damages, and then to assess fault to those defendants and award damages. An inconsistent verdict, however, must be read as a whole, with the rule that the judgment shall be just, legal and proper upon the record on appeal. La. C.C.P. art. 2164; Parliman v. Kennelly, 520 So.2d 445 (La.App. 5th Cir.1988). The court may refer to the entire record to construe an ambiguous verdict. Rodrigue v. Ziifle, 288 So.2d 680 (La.1974).
Id. at 368.
We agree with the reasoning of the Second Circuit and find it applicable to this case. In this case, the jury could have found that Mr. Thomas was at fault in the cause of the accident by entering the intersection before his light was green, and also that Mr. Anthony shared some responsibility because, although he was legally in the intersection he could have stopped at the median strip and avoided the accident.
Defendant alleges that the jury erred in finding that defendant Victor Thomas was 70% at fault in the cause of this accident. Plaintiff argues that the jury erred in assigning any percentage of fault to him and that defendant was 100% at fault in the cause of the accident.
|uIn this case, both the plaintiff, Mr. Anthony, and the defendant, Mr. Thomas, testified that the light was green when each entered the intersection. Plaintiffs expert testified that it was his opinion that Mr. Thomas, in seeing the yellow light, anticipated the green light and entered the intersection prematurely. Dr. Erlich further testified that Mr. Thomas had time to perform evasive maneuvers to avoid the accident, and that he failed to do so. The jury chose to find plaintiff and his expert more credible than the witnesses testifying for the defense, and found that Mr. Thomas was 70% at fault in the cause of the accident.
Both .defense experts testified that Mr. Anthony could have avoided this accident if he had stopped in the median. The jury apparently gave credence to this testimony as well, since it assessed fault to Mr. Anthony of 30%. Based on the record before us, we cannot say that the jury was manifestly erroneous or clearly wrong in its findings.
The defendant next alleges that the jury erred in finding that plaintiffs neck and back injuries were related to the accident at issue in this. suit. The record before us reflects that while plaintiff had some complaints of pain before the accident, there was no indication that the complaints were severe enough to warrant diagnostic testing. Once the accident had occurred, plaintiffs pain and numbness in this left arm progressed to the point where *209 an MRI was conducted. This diagnostic tool revealed cervical bulging at the C5-6 and C6-7 area. Testimony established that this condition was degenerative, and probably predated the accident. However, testimony also established that the MRI showed a condition which could have been asymptomatic prior to the accident, becoming symptomatic |1Rafter the accident. We cannot say that the jury committed any error in finding that plaintiffs back problems were related to the March 18, 1997 accident.
Defendant alleges that the jury erred in awarding future medical expenses of $21,100.00.
In order to recover future medical benefits, the plaintiff must prove that these expenses will be necessary and inevitable. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable cost. However, when the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award.
Hopstetter v. Nichols, 98-185 (La.App. 5 Cir. 7/28/98), 716 So.2d 458, 462, writ denied, 98-2288 (La.11/13/98) 731 So.2d 263.
At trial, Dr. Dale testified that Mr. Anthony’s condition had not responded to conservative treatment. Dr. Nutik stated that surgery consisting of a discectomy and laminectomy would be an option if plaintiffs condition did not improve. Mr. Anthony testified that he would undergo the surgery if it would provide him relief from pain. Dr. Murphy stated that the cost of such future surgery would range from $15,000.00 to $30,000.00. We cannot say that the jury erred in awarding future medical expenses in this matter.
Defendants next argue that the jury erred in awarding past lost wages as there was no evidence of same. Defendant also argues that the judge erred in giving a jury charge on past lost wages. Plaintiff argues that the judge erred in failing to submit the question of future lost wages to the jury.
|16To recover for actual wage loss, a plaintiff must prove the length of time missed from work due to the tort and must prove past lost earnings. Past lost earnings are susceptible of mathematical calculation from evidence offered at trial. An award for past lost earnings requires evidence as reasonably establishes the claim, which may consist of the plaintiffs own testimony. An award for past lost earnings is not subject to the much-discretion rule when it is susceptible • of mathematical calculation from documentary proof. The plaintiffs uncorroborated, self-serving testimony will not be sufficient to support an award if it is shown that corroborative evidence was available and was not produced. To obtain an award for future loss of earning capacity, a plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident exists. Future loss of earnings, which are inherently speculative, must be proven with a reasonable degree of certainty, and purely conjectural or uncertain future loss of earnings will not be allowed. [Citations omitted].
Wehbe v. Waguespack, 98-475 (La.App. 5 Cir. 10/28/98), 720 So.2d 1267, 1275, 1276; writ denied, 98-2907, 98-2970 (La.1/15/99), 736 So.2d 211, 213; citing Mathews v. Dousay, 96-858 (La.App. 3 Cir. 1/15/97), 689 So.2d 503.
In this case, Mr. Anthony testified that prior to the accident he had been collecting workers’ compensation. Dr. Murphy, the treating physician for the work related accident, testified that Mr. Anthony could not return to the type of work he had been doing before the work related accident. While the evidence at trial established that defendant was unable to work after the accident, and would have restrictions on his ability to work in the future, plaintiff offered no proof of any *210 kind as to actual lost wages as a result of the accident at issue. Accordingly, we find that the jury erred in awarding lost wages.
|17Likewise, plaintiff offered no proof of any kind as to the length of disability, degree of impairment or potential wage loss in the future as a result of this accident. Accordingly, we find no error in the trial judge’s failure to give a jury charge regarding future lost wages, as there was no evidence presented to support an award for future lost wages.
Defendant also argues that the jury award for general damages was clearly excessive in this case. In our review of this allegation, we are guided by the Louisiana Supreme Court’s pronouncement in Andrus v. State Narro Mut. Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206, 1210:
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979). The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Id. Only if the reviewing court determines that the trial court has abused its “much discretion” may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Because discretion vested'in the trial court is “great,” and even vast, an appellate court should rarely . disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Reasonable persons frequently disagree about the measure of generál damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier -of fact could .assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.
The testimony at trial established that Mr. Anthony was pinned inside of his car for about forty-five minutes with a collapsed lung, a crushed |ispelvis, and injuries to his head and elbow, during which time he could not breathe and he believed he was paralyzed. His fiancee, who he knew was dead, was pinned in the truck beside him. Mr. Anthony spent 10 days in intensive care, and a total of 17 days in the hospital. Physical therapy was required for him. to walk again, and his right leg drags, he still gets tired while walking and he has difficulty driving. He also has continued neck and back pain, and will probably face surgery in the future. As a result of the accident, he no longer participates in sports activities with his children, and has become what he terms a “couch potato.” Considering the particular injury to this particular plaintiff under the circumstances of this case, we cannot say that the award of $328,800.00 is an abuse of the vast discretion given to the trier of fact.
Finally, plaintiff argues that the trial judge erred in failing to submit the question of scarring to the jury. Plaintiff states that as.a result of the accident he has scarring and his right leg drags, and therefore a jury charge on scarring should have been given. Disfigurement and scarring have as an integral part of their substance the mental pain and anguish that accompany such disfigurement and scarring. Brown v. Southern Baptist Hosp. 96-1990 (La.App. 4 Cir. 3/11/98), 715 So.2d 423; writ denied, 98-0959 (La.5/29/98), 720 So.2d 335. In this case, there was no evidence presented to warrant an award in addition to the award for pain and suffering already given by the jury. We find no error in the trial court’s failure to charge the jury on the question of scarring.
|T9For the above discussed reasons, the judgment is amended to delete the award of $12,000.00 for past lost wages, and as *211 amended, is affirmed. Costs are assessed against defendanVappellants.
AMENDED, AND AS AMENDED, AFFIRMED.

. Charles Hymel, ex-husband of the deceased guest passenger, was a plaintiff in this suit on behalf of decedent’s three minor children. These claims were settled prior to trial.