JAMES WILLIAMS AND LORENG CROUCH

VERSUS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, CHARLES ALLEN
AND STATE OF LOUISIANA, DEPARTMENT
OF PUBLIC SAFETY AND CORRECTIONS

C/W

CHARLES ALLEN

VERSUS

JAMES WILLIAMS, LORENG CROUCH,
AFFIRMATIVE CASUALTY INSURANCE
COMPANY AND STATE OF LOUISIANA,
DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS

NO. 20-CA-248  C/W
20-CA-249

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 68,721 C/W 68,825, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING


February 17, 2021


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Hans J. Liljeberg


**AFFIRMED**
    **FHW**
    **JGG**
    **HJL**

COUNSEL FOR PLAINTIFF/APPELLEE,
JAMES WILLIAMS AND LORENG CROUCH
    Jim S. Hall
    Matthew B. Moreland
    Jennifer L. Crose

COUNSEL FOR DEFENDANT/APPELLANT,
STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS
    Jeffrey M. Landry
    Dennis J. Phayer
    Gregory C. Fahrenholt

**WICKER, J.**

Defendant-State appeals the January 30, 2019 judgment rendered after a jury verdict awarding plaintiff, James Williams, $500,000.00 in general damages for personal injuries sustained in a September 28, 2015 motor vehicle accident, in addition to $2,710.00 in past medical expenses.[1] On appeal, the State complains that the trial court erred in permitting Williams' medical expert to testify that a stroke Williams suffered approximately two months after the accident at issue was causally related to the accident and, consequently, that the jury erred in relying on that testimony in rendering its verdict.

Plaintiffs, Loreng Crouch, the owner of the vehicle driven by Williams and involved in the accident, and Williams, have filed an *Answer to the Appeal*. In the Answer, Williams complains of the granting of a directed verdict in the State's favor as to his claims for past and future lost wages. Crouch complains of the trial court's granting of a directed verdict on her claim for property damage to her vehicle involved in the accident. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises out a September 28, 2015 motor vehicle accident on a three-lane highway, U.S. 51, at its intersection with the I-10 exit ramp in St. John the Baptist Parish. A vehicle owned by Crouch and driven by Williams entered into the intersection to make a left turn onto U.S. 51 and collided with a vehicle driven by co-plaintiff, Charles Allen, causing Williams' vehicle to flip on its side. The testimony at trial reflects that an 18-wheeler was stalled in one of the interstate exit lanes and that Louisiana State Trooper Kory Borcheding was directing traffic at the time of the collision between Williams and Allen.

Williams filed suit in the 40th Judicial District Court for the Parish of St. John the Baptist against the State of Louisiana, Department of Public Safety and

---

[1] The judgment also awarded legal interest and taxable costs.

Corrections (hereinafter the State) for personal injuries sustained from the accident.[2] Charles Allen also filed suit in the 40th Judicial District Court against the State for his injuries sustained in the accident and the two cases were consolidated. The matter proceeded to a three-day jury trial.

At trial, Davis Nickens, an eyewitness to the accident, testified that immediately prior to the accident, he was stopped at a red light in the left-turn lane of U.S. 51 at its intersection with I-10. He testified that he was on his way home from work and that the area was congested, as is common for rush-hour traffic at that intersection. He was the second driver stopped at the red light when he observed a state trooper walk into the intersection. He observed the trooper put his hands up to "stop" traffic in the lane next to him and then observed the trooper walk in front of his lane motioning traffic to remain stopped in that lane as well. Because there was no traffic in the right lane of U.S. 51 at that time, the trooper walked past that lane and did not stop or gesture to that lane. The trooper then walked across the intersection, over to the interstate exit ramp, and began waiving traffic from the exit ramp onto and across U.S. 51.

Nickens testified that shortly after the trooper stopped traffic, the traffic light on U.S. 51, where he had been stopped, turned green. Soon thereafter, Nickens observed a vehicle traveling straightforward in the right lane of U.S. 51 pass through the green light and collide with the second vehicle the trooper had waived into the intersection. Nickens testified that he saw one SUV flip over and smoke everywhere. He testified that, prior to the collision, he had not seen a stalled 18-wheeler or the trooper's vehicle parked behind it. He later discovered that Allen, coincidentally his co-worker, was the driver of the vehicle traveling in the right lane of U.S. 51 involved in the accident.

---

[2] Williams also named Charles Allen and his insurer as defendants in his Petition. Those parties were subsequently dismissed by summary judgment.

Trooper Kory Borcheding testified at trial that as he drove down the interstate off-ramp to approach U.S. 51, he noticed that both lanes of the off-ramp were heavily congested with traffic and he observed an 18-wheeler stalled in one of the two exit lanes. He pulled over and parked his vehicle behind the 18-wheeler to speak with the truck's driver and learned that the vehicle had stalled and that the driver was waiting for a repair mechanic. Concerned that the traffic would back up onto the interstate and create safety concerns, Trooper Borcheding elected to get out of his vehicle and take control of the intersection to direct traffic and alleviate the congestion on the interstate off-ramp.

As he entered the intersection to "take control" of the intersection, he confirmed there were no cars traveling in the right lane of U.S. 51. He proceeded to the adjacent two lanes, made eye contact with the drivers of the stopped vehicles (as the light for those vehicles was red at the time), and put his hand out toward them to make a "stop" gesture so that they understood to remain stopped until further instruction. He then walked back to the traffic exiting the interstate, and he began to waive traffic from the off-ramp to proceed through the intersection.

Trooper Borcheding testified that he was familiar with that intersection and that, historically, the turning vehicles exiting the interstate at that intersection make a wide turn and enter into the shoulder as they turn. To avoid being struck by a turning vehicle, he turned around to walk toward the median where he would then be able to view all traffic and safely direct traffic through the intersection. He acknowledged that after he turned his back, he could not see either the traffic on U.S. 51 or the off-ramp traffic he had just waived through. He testified that he took no more than 3 steps, while his back was turned to the traffic he had just waived through, when he heard a collision. He turned briefly to see the collision occurring and then took a few "hasty" steps away from the collision to get out of harm's way and called for backup.

Trooper Borcheding testified that Williams' SUV was flipped on its side and that Williams was "hanging from his -- in his seat belt." Trooper Borcheding crawled into Williams' SUV from the back hatch, maneuvered to Williams hanging sideways, and managed to help Williams safely exit the vehicle. After the accident, Trooper Borcheding prepared a witness statement wherein he stated that Allen, the driver of the vehicle traveling on U.S. 51, had a green light at the time of the collision.[3]

Allen testified at trial that he was driving home from work on the date of the accident, traveling straightforward in the right lane of U.S. 51 with a green light signal. He testified that he noticed the two left lanes backed up with traffic, which he testified was common at that intersection for the traffic heading towards Baton Rouge during rush hour, so he proceeded in the empty right lane with a green signal. He did not observe either Williams' vehicle or Trooper Borcheding prior to the impact. He testified that hitting Williams' vehicle was "like hitting a brick wall."[4]

Master Trooper Ritchie Stanley with the Louisiana State Police testified that he responded to the scene of the accident within thirty minutes. Trooper Stanley testified that he has investigated approximately 2,000 motor vehicle accidents and that he was familiar with the intersection at issue. Trooper Stanley testified that, in this investigation, he took photographs of the accident scene and interviewed witnesses, including Trooper Borcheding and plaintiffs Williams and Allen. He was also able to download statistical data from Allen's vehicle to determine that Allen was traveling 41 miles per hour seconds before the crash and, thus,

_____

[3] The State stipulated at trial that Trooper Borcheding was acting in the course and scope of his employment with the Louisiana State Police at the time of the accident.

[4] As a co-plaintiff, Allen testified in detail concerning his loss of enjoyment of life due to his injuries and employment history. Allen also called his treating physician, Dr. Dietz, to testify concerning his injuries and Dr. Shelley Savant, a life care planner, as well as Joyce Beckwith, a vocational rehabilitation expert, and Jonathan Stoltz, a Certified Public Accountant, to testify concerning his lost wage and disability claims.

concluded that Allen was not speeding at the time of the accident. He further concluded that Allen had a green light signal traveling on U.S. 51 and that Trooper Borcheding had signaled Williams into the intersection immediately before the accident. He did not issue either driver a moving traffic citation and ultimately concluded that Trooper Borcheding had never secured the right lane of U.S. 51, where the accident occurred.

The medical records introduced into evidence reflect that Williams was transported by ambulance to Ochsner Medical Center immediately after the accident. The records indicated that Williams reported having been in a motor vehicle accident where he was T-boned on the driver's side, causing his vehicle to flip over. He further reported that, "[h]e required assistance to get out of [his] SUV. He was able to stand upon getting out but quickly laid down due to pain in his neck, back and R[ight] shoulder. He feels very stiff." Upon arrival to the emergency room, Williams complained of generalized body pain and was diagnosed with lumbar and cervical strains, generalized pain, and a sprain and strain of his upper arm and shoulder. The medical records also reflect Williams arrived with elevated blood pressure, with a recorded blood pressure of 230/116. Williams was prescribed medication for his pain and discharged.

On November 10, 2015, Williams followed-up with Louisiana Primary Care Consultants, at which time he was diagnosed with cervical, trapezius, and lumbar strains with spasms, a right shoulder strain, a right elbow contusion, and contusions of both upper and lower extremities as a result of the September 28, 2015 motor vehicle accident. Williams returned as directed on November 23, 2015, for a physical therapy appointment. Williams did not return for any future scheduled visits because, on November 28, 2015, he suffered a major stroke, rendering him wheelchair-bound.

At trial, Williams' medical expert, Dr. Richard Sabatier, testified to his opinion, that the stroke Williams suffered approximately sixty days after the accident was causally related to the accident. The trial judge accepted Dr. Sabatier as an expert in the fields in which he was tendered—general surgery and plastic surgery. Concerning his qualifications, Dr. Sabatier testified that he has been in the medical field for 49 years, is licensed to practice medicine in Louisiana, and is Board Certified in general surgery and plastic surgery.

Dr. Sabatier explained further that he has extensive experience in the fields of neurosurgery and vascular surgery, and has treated "hundreds" of stroke patients.[5] Specifically, Dr. Sabatier testified that he completed numerous fellowships in vascular surgery, neurosurgery, craniofacial surgery, and maxillofacial surgery in Great Britain, Canada, Europe, and the United States. He testified to his experience working at the Maida Vale Hospital in London assisting in neurosurgeries on infants and children. He also discussed his one-year position as director of the cranial base surgery unit at Roswell Park Memorial Institute. Dr. Sabatier also testified that he completed a three-year fellowship in macrovascular surgery, or surgery of the blood vessels, at Duke University where he performed all vascular surgeries on various animals. Dr. Sabatier testified that, "my background is unusual in that so much of the emphasis has been on neurological surgery and injuries and conditions involving the brain and spinal cord."

Dr. Sabatier testified that he treated Williams on only one occasion, November 10, 2015, at Louisiana Primary Care Consultants. On that date, Dr. Sabatier ordered a cervical MRI, which he never obtained because, shortly thereafter, Williams suffered a stroke. Dr. Sabatier reviewed all the medical and imaging records from Ochsner Medical Center related to Williams' September 28,

---

[5] Dr. Sabatier testified that he has been previously licensed to practice medicine in Canada, Florida, Kentucky, New York, and North Carolina.

2015 emergency room visit following the accident, as well as those from Williams' November 28, 2015 emergency room visit related to his stroke.

Dr. Sabatier testified that the Ochsner medical records from Williams' November 28, 2015 visit reflect that Williams was unconscious upon arrival and that a CT scan revealed a large hemorrhage in the central part of Williams' brain. Dr. Sabatier explained that the location of Williams' hemorrhage is "at the site where acceleration, deacceleration, rotation injuries damage the brain more often than not." Based on the events of Williams' accident during which Williams' SUV was hit on the driver side and flipped over, causing Williams to hang restrained in his seat belt, Dr. Sabatier testified that he was confident that Williams' stroke was caused by the "forward flexion, backwards motion and rotation from the car accident." Dr. Sabatier further testified that the related medical records demonstrate that the type of stroke Williams suffered can occur up to six months after an injury.

On cross-examination, Dr. Sabatier acknowledged that Williams had a significant family history of vascular issues, including the death of his mother and her siblings resulting from aneurysms or other vascular issues prior to the age of 50. However, Dr. Sabatier maintained that the type and location of Williams' hemorrhage, in addition to the timing of the stroke, indicated it was more likely that his stroke was caused by the accident. He testified that, "patients who have aneurysms have a different type of blood vessel and brain injury than this type of injury."

Lachell Williams testified that she is Williams' sister and his primary caregiver. She testified that, since the stroke, Williams is unable to feed, bathe, or dress himself and that she is responsible for his everyday care. She further testified that, prior to the accident and stroke, Williams was a hard worker and active man. She acknowledged that Williams was obese and had high blood pressure before the

accident, but testified that he had been trying to comply with medications and lead a more active lifestyle at the time of the accident.

Williams provided limited testimony at trial with the assistance of his sister, Lachell. He testified that he has never been in an accident before and has never filed a lawsuit prior to this accident. He also testified that, on the day of the accident, he was working for Technical Coatings Service earning $13.00 per hour and working forty hours or more per week.

Williams testified that, on the date of the accident, he was stopped at the intersection of U.S. 51 and the interstate exit ramp. At some point, a police officer waived to him and motioned for him to cross into the intersection. He proceeded into the intersection, following the officer's direction, and immediately thereafter heard a "boom." After the accident, his "whole body" hurt and he was in "a lot of pain."

Williams' wife, Loreng Crouch, testified that she and Williams married approximately six weeks after the accident at issue. Crouch testified that she was the owner of the vehicle Williams was driving at the time of the accident.[6] She further testified that she did not know the value of the vehicle at the time of the accident and that she never paid to repair her vehicle after the accident. Crouch further introduced into evidence a towing bill she received from Clement Service Station for $421.93, but testified that she never paid the towing bill and never retrieved her vehicle after the accident.

At the conclusion of the plaintiffs' case, the State moved for a directed verdict on Crouch's property damage claim, which the trial court granted. The trial court "carve[d] out" Crouch's loss of use claim concerning the towing bill, which was introduced into evidence.[7] As to Williams' claims, the State moved for a

---

[6] Although Crouch and Williams are still married, counsel references that Williams lost his wife due to the accident and his sister Lachell Williams testified that she is Williams' only caregiver.

[7] However, in the record before us, there is no verdict sheet as to Crouch's towing or loss of use claims.

directed verdict on Williams' lost wage claims, which the trial court granted. The State also moved for a dismissal of Williams' stroke-related claims—asserting that Dr. Sabatier was not qualified to render an expert opinion as to causation of Williams' stroke—, which the trial judge denied.[8]

Following a three-day trial, the jury rendered a verdict in favor of Williams, finding that Trooper Borcheding's negligence caused Williams' injuries, and awarded Williams a total amount of $2,902,710.00.[9] On January 30, 2019, the trial court issued a judgment consistent with the jury verdict but reduced the general damage award to $500,000.00, pursuant to the statutory cap provided in La. R.S. 13:5106(B)(1). The State has appealed the January 30, 2019 judgment, contending that the trial judge abused his discretion in allowing Williams' medical expert, Dr. Sabatier, to testify concerning the causal connection between the accident and Williams' post-accident stroke. Williams and Crouch have filed an *Answer to the Appeal*. In the Answer, Williams complains of the trial court's granting of a directed verdict in the State's favor as to his claims for past and future lost wages. Crouch complains of the trial court's granting of a directed verdict on her claim for property damage to her vehicle involved in the accident. For the following reasons, we affirm.

## DISCUSSION

On appeal, the State contends that the trial judge erred in permitting Dr. Sabatier, a general surgeon who never treated Williams for his stroke-related injuries, to testify concerning a causal link between the accident at issue and

---

[8] The State additionally moved for a directed verdict on the issue of liability, which the trial court denied. The State also moved for a directed verdict on Williams' future medicals, which the trial court granted. Williams does not challenge that ruling and, thus, that ruling is not before us on appeal.
[9] The jury verdict awarded $2,710.00 in past medical expenses; $200,000.00 in past physical pain and suffering; $1,000,000.00 in future physical pain and suffering; $200,000.00 in past mental anguish; $500,000.00 in future mental anguish; $200,000.00 for past loss of enjoyment of life; $300,000.00 for future loss of enjoyment of life; and $500,000.00 for disability.

Williams' post-accident stroke. The State further asserts that the jury erroneously relied on that testimony in rendering its verdict.[10]

The record reflects that Dr. Sabatier was accepted as an expert in the fields of general surgery and plastic surgery, and that the State did not object to his qualifications as an expert in those fields. The State did object at trial, however, to Dr. Sabatier's testimony concerning causation of Williams' post-accident stroke, contending that such testimony exceeded the scope of Dr. Sabatier's qualifications as a general surgeon.

A trial judge has great discretion concerning the admissibility and relevancy of evidence, and has wide latitude to determine whether an expert has the competence, background, and experience to qualify. *Schexnayder v. Exxon Pipeline Co.*, 01-1236 (La. App. 5 Cir. 3/13/02), 815 So.2d 156, 159. A trial court's ruling to qualify an expert to testify at trial will not be disturbed on appeal absent a clear abuse of discretion. *Succession of Olsen*, 19-348 (La. App. 5 Cir. 1/29/20), 290 So.3d 727, 735, *writ denied*, 20-362 (La. 6/3/20), 296 So.3d 1067.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. La. C.E. art. 702; *Par. of Jefferson v. Hous. Auth.*

---

[10] Although not a specific assignment of error identified in its appellate brief, the State emphasizes that it was unaware that Dr. Sabatier would testify at trial concerning a causal connection between the accident and Williams' stroke. However, a review of the record reflects that Dr. Sabatier was listed as a medical expert on Williams' trial witness list. Nevertheless, the record contains no indication that the State conducted any discovery to ascertain whether Williams would attempt to causally link the accident to his post-accident stroke and significant resulting injuries. Moreover, it does not appear that the State deposed Dr. Sabatier, the only listed medical expert in Williams' case, prior to trial.

*of Jefferson Par.*, 17-272 (La. App. 5 Cir. 12/13/17), 234 So.3d 207, 212 (quotations omitted).

The district court performs the important gatekeeping role of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Blair v. Coney*, 19-00795 (La. 4/3/20), ---So.3d---, 2020 WL 1675992, *rehg denied*, 19-795 (La. 7/9/20), quoting *Cheairs v. State ex rel. Dep't of Transp. & Dev.*, 03-680 (La. 12/3/03), 861 So.2d 536, 541. However, courts have consistently recognized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Blair v. Coney*, *supra*, quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Expert testimony is to be weighed the same as any other evidence, and the trier of fact has the discretion to accept or reject, in whole or in part, the opinion of any expert. *King v. Nat'l Gen. Assurance Co.*, 18-281 (La. App. 5 Cir. 12/12/18), 260 So.3d 1298, 1308. Generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect or the weight to be given such testimony, not to its admissibility. *Pennington v. Ochsner Clinic Found.*, 17-0647 (La. App. 4 Cir. 4/25/18), 245 So.3d 58, 65, *writ denied*, 18-1034 (La. 10/8/18), 253 So.3d 791, and *writ denied*, 18-1020 (La. 10/8/18), 253 So.3d 801; *see also Denton v. Vidrine*, 06-0141 (La. App. 1 Cir. 12/28/06), 951 So.2d 274, 285, *writ denied*, 07-0172 (La. 5/18/07), 957 So.2d 152 (wherein a physician, who was not a neurologist or vascular surgeon, was permitted to testify as to the causation of a plaintiff's post-accident stroke); *see also Howard v. United Servs. Auto. Ass'n*, 14-1429 (La. App. 1 Cir. 7/22/15), 180 So.3d 384, 398, *writ denied*, 15-1595 (La. 10/30/15), 179 So.3d 515; *Marshall v. Boydston*, 09-1137 (La. App. 3 Cir. 3/17/10), 33 So.3d 438, 443, *writ denied*, 10-0881 (La. 6/25/10), 38 So.3d 339.

Upon our review of the record, we find that the trial judge did not abuse his vast discretion in permitting Dr. Sabatier to testify as to the causation of Williams' post-accident stroke. The State did not object to Dr. Sabatier's expert testimony as a Board certified general surgeon. Although Dr. Sabatier is not Board certified in neurology or vascular surgery, he discussed at length his experience of treating "hundreds" of stroke victims as well as his various fellowships and residencies in the fields of neurosurgery, pediatric neurosurgery, vascular surgery, macrovascular surgery, craniofacial surgery, and maxillofacial surgery. His experience is over a forty-nine-year medical practice with previous medical licensing in five states within the United States as well as in Canada. Dr. Sabatier testified that he reviewed the Ochsner Hospital records from Williams' November 28, 2015 admission, the date of his stroke, including the imaging records reflecting Williams' hemorrhage in the central part of his brain. Dr. Sabatier testified that "considering the physics of the accident," where Williams' vehicle flipped on its side, in conjunction with the imaging records he reviewed, he was confident that Williams' post-accident stroke was causally related to the accident. Although Dr. Sabatier did not treat Williams for his stroke, nor review all subsequent medical records concerning Williams' post-stroke treatment, we find these issues speak to the weight and effect of Dr. Sabatier's testimony rather than its admissibility. Vigorous cross-examination and the presentation of conflicting medical evidence would appropriately point out any alleged "shaky but admissible evidence." *See Daubert, supra*, 509 U.S. at 596.[11]

Having concluded that the trial judge did not abuse his great discretion in admitting the testimony of Dr. Sabatier, we consequently find that the jury did not err in relying on such testimony in rendering its verdict. Considering the jury

---

[11] The record contains no indication that any pre-trial discovery concerning Dr. Sabatier's qualifications or anticipated testimony was conducted. No request for a *Daubert* hearing or any pre-trial motions *in limine* were filed seeking to exclude Dr. Sabatier's testimony.

heard no conflicting expert testimony or evidence concerning the causation of the stroke, we cannot say that the jury was manifestly erroneous in accepting Dr. Sabatier's testimony and in finding that Williams' post-accident stroke was caused by the accident at issue. Moreover, given the extent of Williams' personal injuries, rendering him bed-bound and wheel-chair bound for the remainder of his life and having to be fed and bathed with the assistance of his sister on a daily basis, we further conclude that the jury did not abuse its vast discretion in awarding general damages, which were reduced to $500,000.00.[12]

### *Answer to the Appeal*

*Crouch's Claims*

In an Answer to the Appeal, Crouch seeks review of the trial court's granting of the State's motion for a directed verdict and the dismissal of her property damage claim.[13]

The January 30, 2019 judgment on appeal is a judgment in favor of plaintiff Williams and against the State. Crouch is not a named party included in the January 30, 2019 judgment. A separate judgment was rendered in favor of co-plaintiff Allen and against the State concerning Allen's claims. However, the record before us contains no judgment as to any of Crouch's claims and we are unable to determine if there is in fact a separate, final judgment concerning Crouch's claims that is not included in the record on appeal. Accordingly, we find there is no final judgment before us as to Crouch's claims and therefore nothing for this Court to review on appeal.

---

[12] The jury is afforded great discretion in awarding general damages. *King v. Nat'l Gen. Assurance Co.*, 18-281 (La. App. 5 Cir. 12/12/18), 260 So.3d 1298, 1309. The State conceded at oral argument that, should we find Dr. Sabatier's testimony—that the accident at issue caused Williams' post-accident stroke—admissible, the amount of the jury verdict was well within its discretion.

[13] Although the trial court "carve[d] out" Crouch's claim concerning the expenses related to towing her vehicle, there is no verdict sheet or judgment as to Crouch's towing expenses claim in the record on appeal. Therefore, that issue was apparently not actually addressed by the jury and therefore is not before us in this appeal.

*Williams' Claims*

At the close of Williams' case, the State moved for a directed verdict on Williams' claims for past and future lost wages. The trial court granted the motion for a directed verdict, finding that there was insufficient evidence upon which the jury could consider and base an award for lost wages.

A motion for a directed verdict is a procedural device available in jury trials for purposes of judicial economy. *Baudy v. Travelers Indem. Co. of Conn.*, 13-832 (La. App. 5 Cir. 4/09/14), 140 So.3d 125, 131. The motion should be granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary result. *Greene v. Lovisa*, 16-660 (La. App. 5 Cir. 5/17/17), 221 So.3d 270, 275-76, *writ denied*, 17-1017 (La. 10/9/17), 227 So.3d 837. On the other hand, the motion should be denied and the case submitted to the jury, if evidence is produced in opposition to the motion that has such quality and weight that reasonable and fair-minded men, exercising impartial judgment, might reach different conclusions. *Id.*

The trial court has great discretion in determining whether a directed verdict should be granted. *Baudy v. Travelers Indem. Co. of Connecticut*, 13-832 (La. App. 5 Cir. 4/9/14), 140 So.3d 125, 131; *see also Joseph v. Cannon*, 609 So.2d 838, 843 (La. App. 5 Cir. 1992), *writ denied*, 623 So.2d 1330 (La. 1993), *cert. denied*, 510 U.S. 1097, 114 S.Ct. 935, 127 L.Ed.2d 226 (1994); *Rabalais v. St. Tammany Par. Sch. Bd.*, 06-45 (La. App. 1 Cir. 11/3/06), 950 So.2d 765, 769, *writ denied,* 06-2821 (La. 1/26/07), 948 So.2d 177; *Scott v. Entergy Louisiana, LLC*, 20-0136 (La. App. 4 Cir. 11/4/20), *writ denied*, 20-1392 (La. 1/26/21). The standard of review for the appellate court is whether, viewing the evidence

submitted, reasonable people could not reach a contrary result. *Baudy, supra* at 131. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law related to the claims. *Id.*

As a general rule, awards for past and future lost wages are considered special damages, i.e., those which can be established to a reasonable mathematical certainty. *Ezzell v. Miranne*, 11-228 (La. App. 5 Cir. 12/28/11), 84 So.3d 641, 651-52; *Cottle v. Conagra Poultry Co.*, 06-1160 (La. App. 3 Cir. 3/14/07), 954 So.2d 255, 256 (citation omitted). To recover for actual wage loss, a plaintiff must prove the length of time missed from work due to the tort and must prove past lost earnings. Past lost earnings are susceptible of mathematical calculation from evidence offered at trial. An award for past lost earnings requires evidence as reasonably establishes the claim, which may consist of the plaintiff's own testimony. An award for past lost earnings is not subject to the much-discretion rule when it is susceptible of mathematical calculation from documentary proof. The plaintiff's uncorroborated, self-serving testimony will not be sufficient to support an award if it is shown that corroborative evidence was available and was not produced. *Hymel ex rel. Hymel v. Thomas*, 99-826 (La. App. 5 Cir. 12/21/99), 758 So.2d 201, 209.

To obtain an award for future loss of earning capacity, a plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident exists. However, future loss of earnings, although inherently speculative, must be proven with a reasonable degree of certainty, and purely conjectural or uncertain future loss of earnings will not be allowed. *Hymel ex rel. Hymel v. Thomas*, 758 So.2d at 209; *see also Bennett v. Stribling*, 96-1012 (La. App. 1 Cir. 3/27/97), 694 So.2d 991, 993.

At trial, the testimony concerning Williams' employment history or wage earnings history was scarce. The only testimony presented concerning Williams'

employment was Williams' limited testimony that, at the time of the accident, he worked at a "paint" business, Technical Coating Services, making $13.00 an hour and working forty "plus some" hours a week. Williams did not testify as to his job title, what his job duties entailed, or how long he had worked at Technical Coating Services or generally in that field. No testimony from his employer or co-workers was presented and no employment records, tax records, paycheck stubs, or any other documentary evidence was introduced into evidence to corroborate Williams' limited testimony. Although Williams' sister testified, generally and briefly, that Williams was a hard-worker who had "always worked," she did not testify to any specifics concerning Williams' employment history (such as how long he had been with his employer at the time of the accident or any history of other previous employment or anticipated future employment).

On appeal, Williams contends that the jury could have considered the testimony of Jonathan Stoltz, the C.P.A. retained by co-plaintiff Allen, to assist the jury in a determination of Williams' future wage loss calculation. Jonathan Stoltz, C.P.A., testified at trial during Allen's case-in-chief that he was retained to "come to court today and give calculations concerning Mr. Allen's lost wages and future medical costs." He did not have any knowledge of Williams' employment history or capabilities (and neither did the jury), and did not opine on Williams' work life capacity or expectancy. He was not questioned at trial on any of those issues as they pertain to Williams.

The jury was presented with minimal information concerning Williams' employment history and was provided no testimony or evidence to show Williams' specific job duties or to prove that he would have continued to work in the same field or position for the remainder of his work life expectancy period. Williams asked that the jury be permitted to calculate his future loss of wages claim by considering Stoltz's testimony presented in Allen's case-in-chief, wherein Stoltz

testified as to Allen's work life expectancy as a pipefitter and stated that he calculated future lost wages by applying "a 3.25 percent inflation rate using that 1 percent discount rate."

In granting the State's motion for a directed verdict, the trial judge stated that he did not believe the jury could do the "mental or arithmetic gymnastics to get to an answer in this matter" with the limited evidence presented at trial. Upon our review of the record and considering the lack of evidence presented at trial on this issue, we cannot say that the trial judge abused his discretion in granting the State's motion for a directed verdict on Williams' lost wage claims.

## DECREE

Accordingly, for the reasons provided herein, the January 30, 2019 judgment of the trial court is affirmed.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 17, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 20-CA-248
### C/W 20-CA-249

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
JIM S. HALL (APPELLEE)          DENNIS J. PHAYER (APPELLANT)          GREGORY C. FAHRENHOLT
                                                                     (APPELLANT)

**MAILED**
JENNIFER L. CROSE (APPELLEE)          HONORABLE JEFFREY M. LANDRY
MATTHEW B. MORELAND (APPELLEE)        (APPELLANT)
ATTORNEYS AT LAW                      ATTORNEY GENERAL
800 NORTH CAUSEWAY BOULEVARD          LOUISIANA DEPARTMENT OF JUSTICE
SUITE 100                             1885 NORTH 3RD STREET
METAIRIE, LA 70001                    6TH FLOOR, LIVINGSTON BUILDING
                                      BATON ROUGE, LA 70802